UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TIMOTHY MANNING and<br>JOSEPH BRYSON,<br>　Plaintiffs,<br><br>　　v.<br><br>MASSACHUSETTS OFFICE OF THE<br>CHIEF MEDICAL EXAMINER;<br>JOHN CRONIN, individually and in his<br>official capacity as Chief Administrative<br>Officer of the Office of the Chief Medical<br>Examiner; RICHARD EVANS, individually<br>and in his official capacity as Chief Medical<br>Examiner of the Commonwealth of<br>Massachusetts,<br>　Defendants | **COMPLAINT**<br>And jury trial demand<br><br>**04 10508 DPW**<br><br>RECEIPT # 54520<br>AMOUNT $ 150<br>SUMMONS ISSUED ___<br>LOCAL RULE 4.1 ___<br>WAIVER FORM ___<br>MCF ISSUED ___<br>BY DPTY. CLK. ___<br>DATE 3-12-04 |

1.  This is a civil rights action brought by two former employees of the Massachusetts Office of the Chief Medical Examiner. The plaintiffs, Timothy Manning and Joseph Bryson, revealed widespread irregularities in that office, including misuse of federal grant funds, rampant conflicts of interest, inefficiencies and incompetence, and the questionable sale of human body parts. Their complaints led to state and federal investigations and the firing of the Chief Medical examiner. Nonetheless, shortly after the defendant John Cronin assumed the top administrative position in the office, he called Manning to a meeting, asked to see Manning's "whistleblower's card," and launched efforts to remove Manning from the office. Eventually, both plaintiffs' positions were eliminated allegedly for financial reasons, even though the office's budget was increased from prior years. This complaint alleges violations of the Massachusetts Whistleblower Protection Statute, M.G.L. 149, § 185, and the First Amendment of the United States

Constitution. The plaintiffs seek reinstatement, compensatory and punitive damages.

## Jurisdiction

2. The action arises under the First and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983. This Court has jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights), 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Venue is proper pursuant to 28 U.S.C. § 1391(b). The plaintiffs further invoke the supplemental jurisdiction of this court pursuant to 28 U.S.C. § 1367 to hear and decide their state law claims.

## Parties

3. Timothy Manning ("Manning") is a resident of Stoughton, Norfolk County, Massachusetts.

4. Joseph Bryson ("Bryson") is a resident of Lynn, Essex County, Massachusetts.

5. The defendant Commonwealth of Massachusetts Office of the Chief Medical Examiner ("OCME") is an instrumentality of the Commonwealth of Massachusetts and is part of the Executive Office of Public Safety. The Office of the Chief Medical Examiner determines the cause and manner of death in cases under its jurisdiction. The agency accomplishes this mission through case investigations and through the performance of autopsies and laboratory studies.

6. The defendant John Cronin ("Cronin") is a resident of Massachusetts. At times relevant to this action, he was the Chief Administrative Officer of the Commonwealth of Massachusetts Office of the Chief Medical Examiner. He is named individually and in his official capacity.

7. The defendant Richard J. Evans ("Evans") is a resident of Fitchburg, Worcester County, Massachusetts. At times relevant to this action he served as the Chief Medical Examiner of the Commonwealth of Massachusetts. He is named individually and in his official capacity.

## FACTS

### Timothy Manning

8. Timothy Manning was hired as a junior accountant at the OCME in February 1983. In July 1999, he was promoted to Chief Financial Officer; a position where he primarily functioned as the head accountant of the department. At all relevant times, Manning was a member of the National Association of Governmental Employees ("NAGE") Unit 6.

9. The OCME is funded in part through federal grants and in part through state funds.

10. As Chief Financial Officer, Manning was familiar with virtually all financial information concerning the OCME, including information about its budget and about federal grant money, payroll and spending.

11. In 1998, Manning, then a staff accountant, became concerned about a number of financial irregularities in the operation of the office. He was concerned that large amounts of federal grant funds were being used to pay salaries of staff members, seemingly in violation of federal law. He was concerned about the OCME's costly contract with the University of Massachusetts Medical School to provide toxicology services that had been provided in the past without charge. He was concerned that in conjunction with that University of Massachusetts contract, expensive equipment, including a number of computers and luxury SUVs, were provided to members of the staff.

12. Manning was also concerned about the relationship between the OCME and a consulting business named Crest Associates, which was managed by Richard St. Louis ("St. Louis"), former Chief of Staff at the Executive Office of Public Safety.

13. In spring 1998, Manning met with Robert Hayden, Undersecretary at the Executive Office of Public Safety. During their meeting, Manning reported his concerns to Hayden.

14. Manning told Hayden that he found it unusual that while there appeared to be insufficient money even to purchase soap or paper towels for the OCME bathrooms, five new sport utility vehicles had been purchased by the office.

15. Manning reported to Hayden that there were unopened boxes of new computers and that when inspectors came to the office, Manning was ordered to hide the computers in the boiler room.

16. Manning reported to Hayden that when an OCME employee had been accused of stealing $13,000 from an OCME property closet, State Police officers were assigned to the OCME to conduct an investigation of the alleged theft. Manning felt that this investigation was inappropriate and that the fact that no criminal charges resulted was evidence of a cover-up.

17. Manning complained to Hayden of patronage hiring in the OCME. Specifically, he complained that Mark Fairbank, OCME Chief of Operations; Richard St. Louis, Associate Chief, and Eileen Honan, Chief Fiscal Officer, had been hired by the OCME without experience and without having taken a civil service exam. He complained that these political appointees were taking the jobs of others who were more qualified.

18. Manning reported to Hayden that while Manning was on vacation, Fairbank had an OCME staff accountant credit Fairbank with a $10,000 merit raise. In exchange for this "raise," Fairbank had told the staff accountant that he would

receive two $500 voucher payments for tuition. Manning learned of Fairbank's "raise" and the voucher payments by reviewing payroll records.

19. Manning reported to Hayden that an OCME staff photographer was using an OCME snowplow for personal use.

20. Manning reported to Hayden that he suspected unauthorized use of the OCME's Home Depot credit line. Manning had seen unauthorized names on Home Depot invoices.

21. Manning also reported larger spending concerns. Specifically, Manning questioned why the OCME contracted at substantial expense with the University of Massachusetts Medical Center Toxicology Laboratory for toxicology testing. Manning knew that the State Police, as a part of the OCME, which previously performed the same testing in the same time and with the same quality at no extra cost to the OCME.

22. Manning also expressed his concerns regarding the propriety of a business called Tissue Bank International working in the OCME. Tissue Bank International ("TBI") describes itself as a "non-profit network of eye and tissue banks." TBI entered into an arrangement with the OCME to place TBI employees in the OCME office to facilitate the procurement of organs and tissue for harvesting.

23. Manning reported to Hayden that TBI employees were holding themselves out as employees of the OCME and were answering telephones by saying "Chief Medical Examiner's Office." Manning believed that by doing this, TBI was confusing law enforcement, medical doctors and families who thought they were dealing with a state agency when, in fact, they were discussing their family member's organ donation intentions with an agency that stood to profit from the sale of the organs.

24. Manning's concerns about TBI did not stop there. Manning had reason to believe, and reported to Hayden, that because of the TBI/OCME set-up, appropriate

consent for organ donation was not being obtained in all cases. Manning's concerns were based, in part, on reports from OCME employees that organs were being harvested inappropriately.

25. Hayden asked Manning to provide all of the reported information to the Attorney General's office. Hayden also suggested removing Manning from the OCME for his own protection. Manning was told at this meeting that he had "whistleblower status" and because of that he declined the offer to remove him from OMCE.

26. Not long after, Manning had another meeting with Hayden and Susan Prosnitz, EOPS Chief Legal Counsel. During this meeting, Manning and another OCME employee reported that organs had been procured from a decedent who had, in fact, been taken off of his respirator while his family was *en route* to the Commonwealth from Puerto Rico. The decedent's family did not know about his death and the organ harvest until after they arrived in the Commonwealth.

27. Manning subsequently met with a State Police Lieutenant at the Attorney General's office regarding the information he reported to Hayden.

28. Few, if any, changes were made in the OCME's operations following Manning's reports. In fact, no one from EOPS ever got back to Manning regarding the information he reported. However, upon information and belief, it became known among OCME managers that Manning had revealed this information. As a result, Manning's work situation became strained and stressful.

29. In early 1999, St. Louis was fired from OCME. In 1998 he formed Crest Associates, a business that contracted with municipalities to obtain public safety grants from the federal government. St. Louis and Crest Associates subsequently hired many people from state public safety agencies and retained close ties with managers in state public safety agencies, including the OCME.

30. In July 1999, Eileen Honan was fired from her position as Chief Fiscal Officer of OCME.

31. Manning assumed Honan's duties, however he received no additional salary or title and, in fact, Evans refused to speak with him or to provide him with administrative support.

32. By May 2000, Manning was experiencing extreme stress resulting from the apparent failure of his whistleblowing complaints to have any effect on the operations of the OCME. Improprieties continued and the backlash against Manning was becoming clear to him. For example, on occasion Manning would arrive at work and find his personal belongings moved to different locations throughout the building.

33. As a result of this stress, in May 2000 Manning was hospitalized and diagnosed with a heart condition. He began a medical leave from work that would last until April 2002.

34. When Manning returned to the OCME in April 2002 he learned that he was no longer acting as the CFO and, as a result, his job duties and functions were unclear. He also learned that none of the deficiencies he had reported had been corrected and, in fact, the misuse of federal grants had only increased.

### Joseph Bryson

35. The plaintiff, Joseph Bryson was hired by the OCME as a morgue technician in 1999. In June 2002 he changed positions and became an administrative assistant. From June 2002 until the time of his discharge, Bryson was a member of NAGE Unit 6. In January 2003 he was elected Unit 6 union steward.

36. Manning consulted frequently with Bryson about his concerns about improprieties in the OCME. Manning informed Bryson of everything that he had previously reported. The two became close friends and discussed these improprieties often. They worked together to bring this misconduct to the attention of the proper authorities.

37. Bryson also had his own knowledge of perceived illegalities within the OCME. For example, Bryson was particularly concerned with TBI's practice of contacting the families of decedents, often before the families knew of their loved one's death, and requesting organ donation. Bryson felt that this practice was deceitful, a violation of the decedent's privacy, and that it often times resulted in organ harvesting without the proper safeguards.

## Facts common to Manning and Bryson

38. Manning viewed Evans' refusal to return him to his previous position and responsibilities as retaliation for his having reported improprieties about the OCME. Finally, on April 3, 2003, Manning sent a memorandum to Evans seeking to clarify his position and salary and asking for a meeting.

39. Before that meeting took place, Evans appointed the defendant John Cronin as Chief Administrative Officer of the OCME. Cronin was closely allied with St. Louis, who by that time was managing Crest Associates, which had several contracts managing federal grants through the OCME and with public safety agencies throughout the Commonwealth. Cronin was aware that Manning had alleged improprieties concerning St. Louis and Crest Associates.

40. In April 2003, shortly after Cronin's arrival at OCME, Cronin called Manning into a meeting and told him that he would not be working on budget matters.

41. Following the meeting, and sensing that he was not getting the type of resolution he was seeking with regard to his personnel issues, Manning sent a memorandum to Evans, Cronin, and Jacqueline Faherty, senior counsel at the OCME. In this memorandum, Manning discussed his 1998 meetings with EOPS and the Attorney General's office. Manning wrote that he considered himself to have whistleblower status as a result of those meetings. Manning also wrote that he believed Evans, Cronin and Faherty were aware of the meetings.

42. Shortly after Manning sent that memo, Cronin submitted a lay-off list to Manning's union that called for his layoff, however, the union managed to block that layoff..

43. On May 14, 2003, Manning and Bryson met with Cronin and Faherty for a three-hour meeting. During this meeting Manning said that OCME financial problems were the result of a "regime" of persons connected with St. Louis and Crest Associates maintaining ties with the office through consulting and contract work. Cronin became visibly upset at this accusation and repeatedly demanded that Manning say whether he had information that Cronin was connected with St. Louis. Faherty made the same demand. Manning said he couldn't answer that question.

44. At that meeting, Cronin contemptuously asked Manning if he had brought his "whistleblower's card" with him. Faherty laughed at that comment.

45. Manning also told Cronin about additional financial improprieties, including Manning's belief that federal grant funds were being used illegally to supplement management salaries. Manning complained to Cronin about patronage occurring in the OCME and its effect on the office's operations

46. Bryson, too, raised his concerns at this meeting, especially his concerns about the improper relationship between Tissue Bank International and the OCME.

47. During the meeting Cronin threatened Manning that layoffs were "still on the table."

48. Cronin discouraged Manning and Bryson from reporting their allegations to Cronin's supervisor, Public Safety Secretary Edward A. Flynn, saying there would be severe repercussions if the two went "over my head." Because of that threat, Manning and Bryson did not report their allegations to Secretary Flynn.

49. Cronin continued his efforts to remove Manning and Bryson from the OCME. Finally, on July 25, 2003 Cronin announced that he had eliminated the entire

financial staff, including Manning, for financial reasons. Because Manning's seniority with the office went back, literally, to its inception, he had seniority over all other administrative employees and, as a result, the only way Manning's employment could be terminated would be to eliminate all financial positions in the office. Although claiming to have eliminated all financial positions, Manning's work continued to be performed by another OCME employee.

50. At the same time Manning's position was supposedly eliminated, Cronin eliminated Bryson's position, also supposedly for financial reasons.

51. Bryson's job duties continued to be performed by temporary employees hired by the OCME.

52. Cronin's justification that he eliminated the plaintiffs' positions for financial reasons was a pretext. In fact, the legislature had just dramatically increased the OCME's budget.

53. The real reason why Cronin eliminated Manning's and Bryson's positions was to retaliate against them for having revealed improprieties and illegal conduct in the OCME and to intimidate them and others from reporting such conduct in the future. When their employment was terminated, Cronin had the hard drives removed from Manning's and Bryson's computers to see what information they contained and to prevent others from accessing that information. On the same day he fired the plaintiffs, Cronin told another employee he had ordered them to immediately leave the office because Manning and Bryson were "risks."

**COUNT I**
**Violation of M.G.L. 149 § 185**
**Defendant Office of the Chief Medical Examiner**

The plaintiffs repeat and re-allege the foregoing.

54. By the above conduct, the plaintiffs disclosed to a supervisor or to a public body an activity, policy or practice of the OCME that the plaintiffs reasonably believed

was in violation of a law, or a rule or regulation promulgated pursuant to law, or which the plaintiffs reasonably believed posed a risk to public health, safety or the environment.

55. The plaintiffs were discharged from their jobs because of they made the above reports of alleged illegal and improper activities in the OCME.

56 The plaintiffs' discharge was a retaliatory action as defined by G.L. c. 149 § 185.

**COUNT II**
**Violation of the First Amendment of the United States Constitution**
**42 U.S.C. § 1983**
**Defendants John Cronin, Richard Evans and OCME**

The plaintiffs repeat and re-allege the foregoing.

57. The plaintiffs' reports to their supervisors and others regarding activities in the Office of the Chief Medical Examiner constituted protected speech under the First and Fourteenth Amendments of the United States Constitution about matters of great public concern.

58. In fact, since the plaintiffs' allegations have been made public, they have been the subject of extensive press coverage and hearings before the Massachusetts General Court and have been the subject of state and federal criminal investigations. Partly as a result of these allegations, Evans, the Chief Medical Examiner has been discharged.

59. The defendants discharged the plaintiffs from their employment because of the plaintiffs' reports.

60. The defendants acted under color of state law in all of the above conduct.

61. The above actions by the defendants violated the plaintiffs' right to freedom of speech as protected by the First and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983.

was in violation of a law, or a rule or regulation promulgated pursuant to law, or which the plaintiffs reasonably believed posed a risk to public health, safety or the environment.

55. The plaintiffs were discharged from their jobs because of they made the above reports of alleged illegal and improper activities in the OCME.

56  The plaintiffs' discharge was a retaliatory action as defined by G.L. c. 149 § 185.

## COUNT II
### Violation of the First Amendment of the United States Constitution
### 42 U.S.C. § 1983
### Defendants John Cronin, Richard Evans and OCME

The plaintiffs repeat and re-allege the foregoing.

57. The plaintiffs' reports to their supervisors and others regarding activities in the Office of the Chief Medical Examiner constituted protected speech under the First and Fourteenth Amendments of the United States Constitution about matters of great public concern.

58. In fact, since the plaintiffs' allegations have been made public, they have been the subject of extensive press coverage and hearings before the Massachusetts General Court and have been the subject of state and federal criminal investigations. Partly as a result of these allegations, Evans, the Chief Medical Examiner has been discharged.

59. The defendants discharged the plaintiffs from their employment because of the plaintiffs' reports.

60. The defendants acted under color of state law in all of the above conduct.

61. The above actions by the defendants violated the plaintiffs' right to freedom of speech as protected by the First and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983.

## **Damages**

62. As a result of the above conduct, each of the plaintiffs has suffered damage to his career and reputation, has suffered emotional distress, has been deprived of wages and benefits, has incurred expenses for legal representation and has otherwise been damaged.

WHEREFORE, the plaintiffs request that this Court order the following relief:

1. That this Court declare that the conduct of the defendants as described above violated the plaintiffs' rights as protected by the First and Fourteenth Amendments to the United States Constitution and by M.G.L. c. 149, § 185.
2. That the defendant Office of the Chief Medical Examiner be ordered, pursuant to M.G.L. c. 149 § 185 and 28 U.S.C. § 2202, to reinstate both plaintiffs into their former positions, with full fringe benefits and seniority rights.
3. That the defendant Office of the Chief Medical Examiner be ordered, pursuant to M.G.L. c. 149, § 185, to compensate each plaintiff for three times their lost wages, benefits and other remuneration, and interest thereon.
4. That the individual defendants be ordered to compensate the plaintiffs for their injuries, pursuant to 42 U.S.C. §1983.
5. That the individual defendants be ordered to pay punitive damages, pursuant to 42 U.S.C. §1983.
6. That the defendants be ordered pay the plaintiffs' reasonable costs and expenses, including legal fees, of this action, pursuant to 42 U.S.C. § 1988 and G.L. c. 149, § 185.
7. That this Court order such other relief as it deems just.

## Jury Demand

The plaintiffs demand a jury trial on all counts.

> Respectfully submitted,
> TIMOTHY MANNING and
> JOSEPH BRYSON
> By their attorneys,
>
> _____
> HARVEY A. SCHWARTZ
> BBO # 448080
> LAURIE A. FRANKL
> BBO # 647181
> Rodgers, Powers and Schwartz, LLP
> 18 Tremont Street, Suite 500
> Boston, MA 02108
> 617-742-7010

Dated: March 11, 2004