# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

TIMOTHY MANNING, and )
JOSEPH BRYSON, )
           Plaintiffs, )
 )
v. )
 )
MASSACHUSETTS OFFICE OF THE )
CHIEF MEDICAL EXAMINER; JOHN )     C.A. NO. 04-10508 DPW
CRONIN, individually and in his official )
capacity as Chief Administrative Officer of )
the Office of the Chief Medical Examiner; DR. )
RICHARD EVANS, individually and in his )
official capacity as Chief Medical Examiner )
of the Commonwealth of Massachusetts, )
           Defendants. )
 )

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### I.      INTRODUCTION

Timothy Manning and Joseph Bryson, former employees of the Commonwealth of

Massachusetts' Office of the Chief Medical Examiner ("OCME"),[1] have sued the OCME as well

as the then chief medical examiner (Dr.Richard Evans hereafter "Evans") and its Chief

Administrative Officer (John Cronin hereafter "Cronin") for allegedly violating their First

Amendment Rights, as well as allegedly retaliating against them for being "whistleblowers."

Their claims under the First Amendment seek prospective injunctive relief solely: the return of

---

[1]The OCME is an agency within the Executive Office of Public Safety Secretariat. Its duties are set out in Chapter 38 of the Massachusetts General Laws. These duties include the establishment of "a comprehensive system to deliver medicolegal investigative services in the Commonwealth." G.L. c. 38 § 2.

their jobs. Their claims under the State Whistleblower Statute, G.L. c. 149, § 185 seek a declaratory judgment, money damages and attorney's fees.[2]

This Court should enter summary judgment for the defendants as there is no basis for plaintiffs' First Amendment claim in that the matters they identified were matters of personal, not public concern. Further, Manning's position was eliminated as a result of the Legislature consolidating redundant administrative and human resource positions, and Bryson's was eliminated as a result of an agency reorganization - not in retaliation for protected speech. Plaintiffs' claims brought under the State Whistleblower Statute suffer from the same infirmity: plaintiffs' concerns were personal ones, not matters of public concern. And, the Whistleblower claim suffers from an additional infirmity: plaintiffs failed to give their employers the statutorily required notice. Finally, all claims suffer from a fatal infirmity: there is no temporal nexus between the alleged protected speech and the acts complained of.

## II.    STATEMENT OF MATERIAL FACTS

In January of 2003, Governor Romney filed his 2004 General Appropriation Budget with the State Legislature. A goal of the Governor's budget was to provide for the consolidation of administrative and human resource functions within certain agencies of the Secretariats. One of these agencies was the OCME. [Exhibit A] The Legislature provided the specific language necessary to implement these consolidations. [Exhibit A] Neither Cronin nor Evans had any part in crafting the Governor's general appropriation budget, nor did they have any part in the

---

[2]By solely requesting prospective injunctive relief in their § 1983 claims Manning and Bryson avoid the Eleventh Amendment proscriptions as well as the case law that the State and any officer sued in his official capacity are not parties subject to suit under that statute. *Ex Parte Young*, 209 U.S. 123, 159 (1908); *Will* v. *Michigan Dep't of State Police*, 491 U.S. 58 (1989).

Legislature's redrafting of the Budget's provisions that provided for the consolidation of administrative and human resource functions within the agencies.

As a result of the passage of this budget, many administrative and human resource positions were eliminated. Timothy Manning, and others in the OCME, held positions that were eliminated in the consolidation. [Exhibit A] Manning protested the elimination of his position, and attempted to assert "bumping" rights, but the Human Resource Division for the Commonwealth of Massachusetts determined that Manning did not have the right to "bump" any other OCME employees out of their jobs. Neither Evans nor Cronin had any authority to make this decision. [Exhibit A]

Further, throughout the implementation of the '04 Budget the Commonwealth's Human Resources Division implemented contractually required human resource procedures within the OCME. Specifically, the Human Resource Division for the Commonwealth provided the requisite notice of any impending layoffs to the Unions. Such notice was given to those union members of the National Association of Governmental Employees ("NAGE") located at the OCME. [Exhibit A] Both Manning and Bryson were members of NAGE. Indeed, Manning and Bryson had each been Union stewards. [Exhibit B; Complaint ¶ 35]

Manning, an employee of the OCME since 1983, alleges that in the Spring of 1998, six years before he brought this complaint, he met with then Executive Office of Public Safety Undersecretary Robert Hayden to complain of a laundry list of problems: insufficient funds for soap and paper towels, but seemingly plenty of money for sports utility vehicles, misuse of federal funds, hidden computers, inappropriate criminal investigations, improper harvesting of human organs, and other inappropriate activities. [Complaint ¶¶ 13-21] As a result of this

3

meeting and a subsequent meeting with Hayden, Manning went to the State Attorney General's Office and spoke to a State Trooper, a Lieutenant Delaney. [Exhibit C] At no point does he state that he gave written notice to his employers before meeting with Lieutenant Delaney.

All the issues Manning spoke of with Undersecretary Hayden and Lieutenant Delaney predated the Spring of 1998. In May of 2000 Manning took a medical leave from the OCME, returning in April of 2002. [Complaint ¶¶ 33-34] Although he offers no authority to establish that he ever was the Chief Financial Officer for the OCME, he, nevertheless, states that upon his return he was informed that he no longer held that particular position. This, he claims, was in retaliation for his criticisms from four years before.

It was not until a year after Manning's return from his two year sick leave, in April of 2003, that Manning requested a meeting with Dr. Evans, the then Chief Medical Examiner. Manning sought to have his workplace position clarified at this meeting. [Exhibit D] The meeting took place that month not with Evans but with Cronin, the newly appointed Chief Administrative Officer for the OCME. Following this meeting Manning sent a memo to Cronin, Evans, and OCME general counsel Jackie Faherty, informing them that he had "whistleblower" status. [Exhibit E] On May 14th Manning, Bryson, Faherty, and Cronin had a three-hour meeting to discuss Manning's workplace concerns. [Exhibit F]

In July of that year, when the '04 General Appropriation Budget was implemented and the consolidation occurred, the redundant human resource and administrative positions within the OCME were eliminated. Three positions, including Manning's, were eliminated in this consolidation. [Exhibit A]

Joseph Bryson was a morgue technician at the OCME. He left this position after filing a

4

worker's compensation claim for a back injury. He briefly returned to the position after the claim, ultimately negotiating a return to work as an Administrative Assistant I. [Exhibit A] As Chief Administrative Officer, Cronin faced significant financial challenges while he sought to foster a more professional office by instituting a more customer service focus at the OCME. To that end, the entry level Administrative Assistant I positions were ultimately eliminated to provide for the more skilled Administrative Assistant II positions. Unlike the Administrative Assistant I positions, these positions required sophisticated customer service skills. As a result of this reorganization Joseph Bryson's position was later eliminated at the OCME. [Exhibit A]

While their detailed complaint neglects to mention that Manning and Bryson ever gave written notice of their intention to file the whistleblower claim here, at his deposition Manning claimed that a series of memos and emails constituted notice of this impending lawsuit. [Exhibit G] This correspondence is replete with references to "personnel" issues, but any notice that Manning or Bryson intended to file a lawsuit to assert any whistleblower claims is noticeably absent. [Exhibit H & D]

### III    SUMMARY JUDGMENT STANDARD

Summary judgment should be granted only where the court, viewing the evidence in the light most favorable to the non-moving party, determines that no genuine dispute of material fact exists. See Fed. R. Civ. P. 56. Although disputed facts are viewed in the light most favorable to the opposing party, the court does not credit "conclusory allegations, improbable references, and unsupported speculation." *Medina-Munoz* v. *R.J. Reynolds Tobacco Co.*, 896 F. 2d 5, 8 (1st Cir. 1990).

The movant has the "initial responsibility of informing the district court of the basis for

its motion and identifying those portions "of the record showing the absence of a genuine dispute of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). Then the non-moving party must demonstrate that "*every essential element* of its claim or defense is at least trialworthy." *Price* v. *General Motors Corp.*, 931 F. 2d 162, 164 (1st Cir. 1991)(italics in original). The nonmovant cannot simply rest upon mere allegations. Instead the nonmoving party must produce specific, provable facts, which establish there is a triable issue. If the evidence is merely colorable or is not significantly probative, summary judgment must be granted. *Cronin* v. *Town of Amesbury*, 895 F. Supp. 375, 382-383 (D. Mass. 1995).

A dispute is genuine if it "may reasonably be resolved in favor of either party." *Cadle Co.* v. *Hayes*, 116 F. 3d 957, 960 (1st Cir. 1997). A fact is material if it has the capacity to sway the outcome of the litigation under the applicable law." *Id.*

## IV.    ARGUMENT

A.    BRYSON AND MANNING CANNOT MEET THEIR BURDEN OF PROOF TO PREVAIL ON THEIR 42 U.S.C. § 1983 CLAIM THAT EVANS, CRONIN, AND THE OCME RETALIATED AGAINST THEM ON ACCOUNT OF THEIR PROTECTED SPEECH

1.    There Is No Temporal Nexus Between the Complained Of Acts and The Alleged Protected Speech.

Manning and Bryson each claim that their complaints resulted in the elimination of their positions. Bryson's claim is unsupported by any facts, and indeed, is unintelligible.

Manning argues that his complaints to then Undersecretary Haynes in the Spring of 1998 ultimately resulted in the elimination of his position over four years later - in July of 2002 when the Legislature passed the General Appropriation Budget that provided for the elimination of

6

redundant positions. Thus, neither Manning nor Bryson can prove a causal connection between the elimination and their complaints. *See Lewis* v. *City of Boston*, 321 F.3d 207, 219 (2003)(close temporal proximity between two events *may* give rise to the inference of causal connection)(italics in original)(citations omitted). Failure to make this causal link is fatal to their First Amendment claims.

Protected activity closely followed by adverse employment action may be helpful, but is not in and of itself sufficient to survive a motion for summary judgment. *See Jalil* v. *Avdel Corp.*, 873 F.2d 701 (3rd Cir. 1989). However, in this case the evidentiary record of the proximity of the plaintiffs' activities to the OCME's alleged retaliatory action is harmful to the plaintiffs. Manning argues that his relevant protected activities were in the Spring of 1998. However, his position was not eliminated until July of 2002 - nearly four years after his so-called protected activity. This temporal relation does not produce a trialworthy issue of causal connection. Despite Manning's attempts to bootstrap his allegedly protected speech, he cannot escape the fact that this speech occurred six years before he filed this complaint and four years before the job loss complained of here.

In addition to the elimination of his position, Manning appears to argue that Cronin and Evans retaliated against him upon his return from his two year sick leave. But this alleged retaliatory action Manning claims, was merely his being informed that he was no longer doing the same tasks as when he departed two years earlier. Such an allegation does not rise to the level of a retaliatory action. "[T]o prove a claim of First Amendment retaliation in a situation other than the classic examples of discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand, plaintiff must show that (1) using an objective standard; (2) the

total circumstances of [his] working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." *Phillips* v. *Bowen*, 278 F. 3d 103, 109 (2d Cir. 2002). In April of 2002, after a medical leave of two years, Manning returned to work, and at the same salary. That he was no longer (if ever) the "CFO" does not constitute an adverse action - particularly after his lengthy absence. [Exhibit A]

> 2.    Manning's and Bryson's Speech Was Not a Matter of "Public Concern", and Thus, Does Not Qualify As a "Protected Activity."

It is important to consider that the State acted here not as a sovereign, but as an employer: "a public employee's right to freedom of speech is not absolute ...." *McKinley* v *Kaplan*, 262 F. 3d 1146, 1149 (11ᵗʰ Cir. 2001)(removal of public board member). When the government is acting as an employer, as it is here, it has broader powers to limit speech then it does when it is acting as a sovereign. *Waters* v. *Churchill*, 511 U.S. 661, 671-672, 689 (1994)(plurality opinion). Further, a governmental employer should be given wide discretion to manage its own internal affairs and personnel. *Connick* at 151.

It is in this context that any constitutional analysis must be applied. When analyzing an employee's First Amendment claim that his governmental employer retaliated against him for speaking out, the courts consider this "complicated relationship between free speech and public employment through the prism of a three-part test extracted from a trilogy of Supreme Court decisions: *Connick* v. *Myers,* 461 U.S. 138, 147 (1983), *Mt. Healthy City Sc. Dist.* v. *Doyle*, 429 U.S. 274, 287 (1977), and *Pickering* v. *Bd. of Educ.*, 391 U.S. 563, 568 (1968). *Perez* v. *Pierluisi*, 339 F. 3d 43, 51 (1ˢᵗ Cir. 2003). The courts consider: (1) whether the speech involves a matter of public concern; (2) whether, when balanced against each other, the First Amendment

interests of employee and public outweigh the government's interest in functioning efficiently, and (3) whether the protected speech was a substantial motivating factor in the adverse action against the employee. *Connick, at* 147; *Mt. Healthy*, at 287; *Pickering* at 568. On this record, both Bryson's and Manning's claims fail at each stage of the three prong analysis. *See Mihos* v. *Swift*, 358 F. 3d 91 (1st Cir. 2004).

At this initial prong of the three prong test, the Court must satisfy itself that this speech involved a matter of public concern. *See e.g. Connick*, 461 U.S. at 147-48; *Fabiano* v. *Hopkins*, 352 F. 3d 447, 453 (1st Cir. 2003); *Tang* v. *State of Rhode Island Dept. of Educ.*, 163 F. 3d 7, 12 (1st Cir. 1998). This is a question of law, and it must be resolved in each case on the basis of the "content, form, and context" of the speech as revealed by the whole record. *Connick* at 147-48.; *Hennessy* v. *City of Melrose*, 194 F. 3d 237, 246 (1st Cir. 1999). If employees, such as Bryson and Manning, speak out only on matters of personal interest, then the First Amendment value of their speech is low. *See Campagna* v. *Commonwealth of Massachusetts*, 206 F. Supp. 2d 120, 126 (D.Mass. 2002)(routine employee grievance and active support of co-worker's employment rights does not activate a matter of public concern for First Amendment purposes). "[A]bsent the most unusual circumstances" the Court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior. Id. Individual complaints about working conditions are not an issue of public concern. *Tang* at 12.

The First Circuit's treatment of workplace grievances in *Tang* is instructive. In *Tang*, the plaintiff, an Asian American woman, alleged race and gender discrimination against her employer, the Department of Elderly Affairs. *Id.* at 10. She claimed that the state retaliated

9

against her for filing numerous workplace grievances. *Id.* Her grievances involved such matters as being placed on a temporary administrative leave, relocation of her office space, relocation of her filing cabinet and being instructed to take phone calls only at her desk. *Id.* at 12. The Court found that these complaints were "individual complaints about working conditions" and were not a matter of public concern. *Id.*

Here, Bryson's and Manning's claims of protected speech fall under two categories: (1) speech that, like Tang's, spoke primarily to workplace concerns, e.g., private contractors answering OCME telephones, hiring choices, moved offices; and (2) rumor and hearsay, e.g., the appearance of Sports Utility Vehicles equated with misuse of federal funds, and alleged improper organ harvesting by the Chief Medical Examiner.

And, as such, the record does not support Manning's and Bryson's claims that Evans, Cronin, or the OCME violated their First Amendment rights. Manning's and Bryson's correspondence did not indicate that they were engaging in any protected activity. Indeed, they show the two to be serial critics of their workplace. In point of fact, both Bryson and Manning served as union representatives whose function it would be to present workplace concerns to their employer. *Cf. Langer* v. *Department of Treasury*, 265 F. 3d 1239, 1267 (Fed. Cir. 2001)(activities expected of an employee as part of his duties do not constitute protected activity under the cognate Whistleblower Protection Act). Manning even admitted that the other employees would go to him if they had concerns about the workplace. And, the substance of both Manning's and Bryson's emails and other correspondence related to their criticism of working conditions.

Further, these so-called issues of public concern are noticeably absent in the

10

correspondence that Manning initiated a year after his return to work. From April of 2003 on,

Manning's correspondence spoke primarily, if not exclusively, to "personnel" issues. Manning's

concerns during the requisite time period are personal workplace concerns, and not public ones.

His correspondence, beginning in April of 2003, speaks for itself and cannot claim - indeed, does

not claim - specific issues allegedly raised in the Spring of 1998. As such, this correspondence

clearly raises personal, not public concerns. *Campagna* v. *Commonwealth of Massachusetts*, 206

F. Supp. 120, 126 (D.Mass 2002), *aff'd on other grounds* 334 F. 3d 150 (1st Cir. 2003); *Smith* v.

*Commissioner of Mental Retardation*, 409 Mass. 545, 552 (1991).

And, when speaking for itself, this correspondence continually addresses Manning's

displeasure with his workplace accommodations, and his particular tasks. The first sentence of

his April 17, 2003 memo to Evans is illustrative and typical:

> "I have been asked to provide Mr. John Cronin and Mrs. Jackie
> Faherty through Mr. Joseph Bryson written details of specific
> **personnel** issues and what I feel can be construed as **unfair labor practices**,
> that I feel need to be corrected as it relates to my current
> health and safety at the CME."(emphasis supplied)[Exhibit D]

This first sentence is followed by a chronology of Manning's tenure at the OCME, and in

public service. It ends with a laundry list of "events" that all focus on Manning's personal

workplace issues. Noticeably absent is any mention of any public concerns. Manning's claim of

"whistleblower" status within this very personal memo smacks of a self-serving appellation used

to shield him from legitimate workplace scrutiny.

And Manning's two emails and one memo that preceded this April 17th memo, did not

highlight any public concerns. They spoke of matters personal to Manning [Exhibit H] Further,

his emails that followed the April 17th memo again spoke of his "personnel issues". [Exhibit H].

11

And, in particular addressed having Mr. Bryson, his union steward, present for the discussion of the "personnel matters." [Exhibit H]

Bryson's examples of protected speech are so spare as to be negligible. What little Bryson wrote, he appears to have done so in his role as a union steward and on behalf of Manning, not himself.

Both Bryson and Manning needed to show that they engaged in a protected activity, i.e., that their speech was a matter of public, not personal, concern. *Tang* at 11-12 (state employee's union grievances about workplace conditions and treatment held not to be a matter of public concern). Manning's deposition identifies the real nature of his complaints: personal workplace issues. There, he again complained, like Ms. Tang, of his office furniture being moved. [Exhibit I] He also notes that other employees would come to him to complain of workplace issues. [Exhibit J] He admits that none of his concerns of alleged "illegal" activity ever prompted him to call the police. His allegation that the OCME photographer used the snowplow for personal reasons did not result in a complaint to the State Ethics Commission. And his allegation that the OCME Home Depot Credit Card was being misused also did not result in a call to the police. [Exhibit K] As for those few matters not directly related to his criticisms of working conditions, Manning made clear that he had no personal knowledge of these matters.

Thus, Manning's 1998 allegations that the OCME was engaging in the illegal sale of human body parts is mere hearsay: really, it is just gossip. And, when at his deposition he was asked to support such an outrageous claim, he retreated - ultimately admitting that he never saw anything, and that what he actually heard was that doctors at Boston Medical Center were allegedly performing these heinous deeds. [Exhibit L] Manning also retreated from his claim

that his "information" generated a federal probe: at his deposition he admitted that a federal

probe regarding the use of federal grant monies throughout several entities existed before he was

ever questioned. [Exhibit M]  That such hearsay comments might be of a voyeuristic interest to

the public is of no moment. *Brayton* v. *Monson Public Schools*, 950 F. Supp. 33, 37 (courts limit

"public concern to information needed to enable citizens to make informed decisions about

operations of government, disclose governmental misconduct, or to generate debate of significant

public interest").  In analyzing a First Amendment retaliation case, "the truth or falsity of the

statements at issue is relevant to both the threshold public concern analysis and the balancing

required under *Pickering*." *Wulf* v. *City of Wichita*, 883 F. 2d 842, 858 n.24 (10th Cir. 1989).  As

*Wulf* noted, "[i]t is difficult to see how a maliciously or recklessly false statement could be

viewed as addressing a matter of public concern." *Id.*; *see also Moore*, 57 F. 3d at 933 (noting

that deliberately or recklessly false statements do not garner First Amendment protection).  His

other allegations are confined to workplace management concerns, and, as such, do not qualify as

matters of public concern.  *Tang*, 163 F.3d at 12 (The First Amendment does not require a public

office to be run as a roundtable for employee complaints over internal office affairs).

   Further the content of this correspondence, predominately internal emails, did not

"provide members of society with information necessary to make informed decisions about

government operations, to disclose public misconduct, or to inspire debate on matters of

significant public interest." *Meaney* v. *Dever*, 326 F. 3d 283, 289 (1st Cir. 2003)(*citing O'Connor*

v. *Steeves*, 994 F. 2d 905, 913 (1st Cir.1993)).  These complaints were predominantly about how

their superiors chose to manage the Office.  As the court in *Tang* observed, "absolute First

Amendment protection is not accorded to any grievance a public employee files against an

employer without regard to its content. If it did anything [an employee] said would ... plant the seeds of a constitutional case." *Id.* at 11-12.

Bryson and Manning cannot meet their burden to prove that their speech was a matter of public concern. Failing this first prong of the test is fatal to their § 1983 First Amendment claims, and Evans, Cronin, and the OCME are entitled to judgment as a matter of law. *See Tang*, 163 F. 3d at 11-12.

 3. Assuming the Court Determines That These Are Matters of Public Concern, the OCME's Interest In Maintaining Public Confidence in the Integrity of the Office outweighs Manning's and Bryson's Speech.

In addition to satisfying the first prong, Bryson and Manning are required to show that theirs' and the public's interest in this public speech outweighs the government employer's interest in the efficient performance in the governmental workplace. *See Pickering*, 391 U.S. 563; *Mullin* v. *Town of Fairhaven*, 284 F. 3d 31, 37 (1ˢᵗ Cir. 2002)(applying the *Pickering* balance test and explaining it is necessary to "accommodate the dual role of the public employer as a provider of public services and as a governmental entity operating under the First Amendment"). Here, the OCME acted as a result of a legislative directive, not as a result of what Bryson and Manning said. As such, it is unnecessary for the Court to balance the competing interests of public employers and public employees. The defendants' actions were controlled by the enactment of the General Appropriations Budget, and an agency reorganization not because of any particular workplace concerns.

 4. Manning and Bryson Have Failed to Offer Proof That Their Speech Was a Substantial Or Motivating Factor in the Elimination of Their Positions.

Finally, even if Bryson and Manning could prevail at these first two prongs, their §1983

claims still fail at the third prong: whether their speech was a substantial or motivating factor in the OCME's decision to eliminate their positions. *See Powell v. Alexander*, 391 F 3d. 1, 17 (1st Cir. 2004)(explaining that plaintiff has the burden of showing that his protected activity was a substantial or motivating factor for the employer's retaliatory action). Bryson and Manning would have the Court ignore that Governor Romney proposed a method of implementing savings in state government. They would further have the Court ignore that these gubernatorial proposals were presented to the Legislature, which amended and then ultimately approved them. And, they would have the Court ignore that these proposals called for the consolidation of administrative positions within state government, which resulted in the elimination of redundant positions such as the one held by Manning.

Instead, Manning and Bryson would require the Court to adopt tunnel vision: demanding the Court review the facts within the constrained confines of Manning's and Bryson's small world, and ignore that a larger, truer picture exists. The full picture establishes that, at best, Manning's and Bryson's myopic view of their own workplace failed to take into account the significant changes instituted in state government. At worst, a fuller picture might reveal that Manning and Bryson were well aware of what was to come and wished to avoid it - thus exaggerating any claims to provide for preemptive cover. *See O'Connor v. Steeves*, 994 F. 2d 905, 912 (1993)(a court may look at the plaintiff's motives). But, there is no need to explore the latter theory as they have failed to satisfy the requisite three-prong test, and thus, their § 1983 claims must fail.

This Circuit has held that plaintiffs need not produce a smoking gun. *Lewis v. City of Boston*, 321 F.3d 207, 219 (2003). And, indeed, the plaintiffs have not produced any weapon.

15

But they were required to produce evidence, circumstantial or direct, to meet their burden here.

In *Lewis*, a case involving a music teacher claiming First Amendment retaliation, the Court rejected the plaintiff's contention that the close temporal proximity between his protected speech and the elimination of his position established the necessary proof. Here, the plaintiffs cannot even point to any temporal proximity between the events.

Further, as in *Lewis*, the plaintiffs cannot ignore the other facts in the record, which demonstrate that their positions were eliminated, in Manning's case, due to the passage of the General Appropriations Budget; and, in Bryson's case, due to the agency reorganization. *Id.*

The question of a government employer's motivation in making adverse employment decisions against an employee who exercised First Amendment rights is usually one for the factfinder, but it can be resolved by the Court on a summary judgment if the employee's evidentiary showing is insufficient. *Perez* at 56 and cases cited. That is the case here. Manning and Bryson fail to point to any evidence linking Evans, Cronin, or the Office itself to the alleged retaliatory actions. Further, they have no evidence that their speech motivated Evans, Cronin, or the OCME to eliminate their positions.

5. If Any Burden of Persuasion Rests on the Defendants, They Have Met It.

Should Manning and Bryson, at this stage, now demonstrate facts to prove that their protected activity was a substantial or motivating factor in the decision to eliminate their positions then the burden of persuasion shifts to Evans, Cronin, and the OCME to show that even absent the protected activity the positions would still have been eliminated. *Mullin* v. *Town of Fairhaven*, 284 F. 3d 31, 38 (1st Cir. 2002). Evans, Cronin, and the Office must show by a preponderance of the evidence that Manning's and Bryson's positions would have been

eliminated in the absence of their speech. *Perez*, 339 F. 3d at 58 (*citing Acevedo-Diaz* v. *Aponte*, 1 F.3d 62, 66 (1st Cir. 1993)). In the face of significant budgetary concerns, the Governor prepared a consolidation of agencies within the Secretariats, which involved the elimination of superfluous positions. This consolidation, contained in the '04 General Appropriations Budget, was approved by the Legislature. As a result of this Legislation, numerous positions in state government were eliminated, including Manning's and, ultimately, Bryson's. It was the nature of their positions, not the nature of their speech that controlled whether they would remain with the OCME. As such, the defendants have sustained any burden of persuasion that might exist here.

      B.      In the Absence of Pendant Jurisdiction, Manning's and Bryson's State Law Claim Should be Dismissed.

Manning's and Bryson's state law claim pertaining to the State Whistleblower Statute should fail in the absence of pendant jurisdiction in federal court. As the Supreme Court held, federal courts must avoid decisions as to state law in the absence of pendant jurisdiction, "both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of America* v. *Gibbs*, 383 U.S. 715, 726 (1966).

Accordingly, this action should be dismissed against all parties.

      C.      Manning and Bryson Cannot Show "Retaliation" Or The Required Written Notice Necessary To Make A Claim Under The Whistleblower Act.

Manning and Bryson allege that Evans, and Cronin violated the State Whistleblower Act by eliminating their positions because of their criticisms of the OCME. Even if they had engaged in such conduct, and even if such conduct had been retaliatory in intent, it would not be sufficient to invoke the protection of the Whistleblower Act.

Manning and Bryson were required to show that Evans or Cronin had engaged in a retaliatory action, which is defined by the Act as including "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." G.L. c. 149, §185(a)(5).

If Manning's complaints are that the changes in his office or duties were retaliatory, this would be insufficient. Although "adverse employment action" has not been construed under the Whistleblower Act, it has been in a number of cases under related state and federal employment laws. Thus, under the Fair Employment Practices Act, G.L. c. 151B, in order to show "adverse employment action," a plaintiff must introduce "objective evidence" that he has been disadvantaged in respect to salary, grade, or other objective terms and conditions of employment." *MacCormack* v. *Boston Edison Co.*, 423 Mass. 652, 663 (1996). Under the cognate federal statute, Title VII, the First Circuit Court of Appeals has held that "[w]ork places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Blackie* v. *Maine,* 75 F. 3d 716, 725 (1st Cir. 1996). Any complaints by Manning that he did not care for the changes in his office or his duties fail to rise to the level of adverse employment actions recoverable under the Whistleblower Statute. And Manning's and Bryson's complaints that the elimination of their positions was an actionable retaliatory action are belied by the reasons for the elimination and their timing: the enactment of the General Appropriations Budget.

Equally fatal to Manning's and Bryson's Whistleblower claims is their failure to give their employer "written notice" and "a reasonable opportunity to correct" the wrongdoing before

18

reporting the allegedly improper activity to a "public body." G.L. c. 149, § 185(c)(1). In *Dirrane* v. *Brookline Police Dep't, et al.*, 315 F. 3d 65 (1st Cir. 2002), the plaintiff had reported the conduct of which he complained to his superiors in the police department, but he had never given written notice before filing his lawsuit in state court. This was held to have barred his claim under the Whistleblower Act.

The statute defines "public body" to include "federal judiciary." G.L. c. 149, § 185(a)(3). Although Dirrane's oral complaints were "repeated and comprehensive and a written notice would likely have produced no different result," the Court held that the Whistleblower Act "is unqualified in its requirement and in this instance a hard and fast rule does serve a rational purpose, namely, by avoiding uncertainties about what might have happened if formal notice had been given." *Dirrane* at 73  Manning and Bryson, like Dirrane, apparently gave no written notice to the defendants prior to the filing of this action. Accordingly, their Whistleblower claims must be barred.

IV    CONCLUSION

Based upon the foregoing, the defendants Evans, Cronin, and the OCME, are entitled to summary judgment in their favor on all counts of the complaint.

> Respectfully submitted,
> COMMONWEALTH OF MASSACHUSETTS
> By and through its Office of the Chief Medical
> Examiner, Dr. Richard Evans and John Cronin, in
> their individual capacities
>
> Defendants,
>
> By Their Attorney,

19

THOMAS F. REILLY,
ATTORNEY GENERAL


/s / Mary O'Neil
Mary O'Neil BBO #379430
Assistant Attorney General
Trial Division
One Ashburton 'Place
Boston, MA. 02118
(617)727-2200 x3331

DATED: April 14, 2005

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TIMOTHY MANNING, and<br>JOSEPH BRYSON,<br>  Plaintiffs,<br><br>v.<br><br>MASSACHUSETTS OFFICE OF THE<br>CHIEF MEDICAL EXAMINER; JOHN<br>CRONIN, individually and in his official<br>capacity as Chief Administrative Officer of<br>the Office of the Chief Medical Examiner; DR.<br>RICHARD EVANS, individually and in his<br>official capacity as Chief Medical Examiner<br>of the Commonwealth of Massachusetts,<br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    C.A. NO. 04-10508 DPW |

AFFIDAVIT OF JOHN CRONIN

I, John Cronin, having personal knowledge of the facts contained herein, hereby depose and say:

1. I am the Chief Administrative Officer for the Agency known as the Office of the Chief Medical Examiner, which is contained within the Executive Office of Public Safety Secretariat.

2. In that capacity I am responsible for implementing Executive and Legislative directives regarding the administrative operation of the Office of the Chief Medical Examiner.

3. In January of 2003 Governor Romney filed his General Appropriations Budget for the 2004 fiscal year. This budget provided for the consolidation of administrative and human resource functions in state government.

4. The budget was not immediately passed by the State Legislature. Subsequently, it provided the language necessary to implement the Governor's proposed consolidations.

5. As a result of the passage of the fiscal 2004 budget, agency restructuring and reorganization was necessitated at the OCME. Thus, three positions were eliminated at the OCME. One of those positions was held by Timothy Manning, another was held by Joseph Bryson.