# Exhibit B

Case 1:04-cv-10508-DPW    Document 17-2    Filed 04/15/2005    Page 2 of 11

Timothy J. Manning, III - February 14, 2005        Manning and Bryson vs. Mass. OCME, et al

**53**

1   time at EOPS. And that is why I had
2   occasion to say hello to the Secretary or
3   Under Secretary. And then down to 784
4   Mass. Avenue in 1995.
5   Q. Okay. So just so I am clear, when you
6   spoke to Mrs. Greeley at the end of 1997
7   or post August of 1997, you had been
8   working with Doctor Evans since 1995?
9   A. Correct.
10  Q. Okay. And just to be clear, you did not
11      believe him to be incompetent as you
12      testified earlier?
13  A. No.
14  Q. Okay. And you didn't have any question
15      about the fact that he had a valid medical
16      license?
17  A. No.
18  Q. Okay. So what was your specific concern
19      about Doctor Evans that you expressed to
20      Mrs. Greeley?
21  A. Basically, it became obvious that the
22      Agency was heading in a direction that was
23      best for consultants.
24  Q. Can you be more specific?

**54**

1   A. It appeared that the Agency was moving
2       away from a neutral function as a Medical
3       Examiner system.
4   Q. What do you mean neutral function?
5   A. Well, basically, a Medical Examiner, I
6       believe, should do an autopsy and just use
7       his medical knowledge and not favor one
8       side, defendant, or one side, the
9       plaintiff.
10  Q. Okay.
11  A. But basically, this is what happened. But
12      back then --
13  Q. Back then being 1997?
14  A. In 1995, when he came.
15  Q. '95. Okay.
16  A. I mean we had had cases like the Reggie
17      Lewis case, you had --
18  Q. Well, what do you mean the Reggie Lewis
19      case?
20  A. I mean there was a couple of high profile
21      cases.
22  Q. Okay.
23  A. That it appeared that with this group that
24      Doctor Evans was swaying towards the

**55**

1   pro-public safety side.
2   Q. Are you saying that Doctor Evans did
3       something illegal?
4   A. I am not an attorney. I couldn't answer
5       that.
6   Q. Well, did you feel the need to report him
7       to the police?
8   A. I felt the need to report him to the
9       Secretary.
10  Q. The Under Secretary?
11  A. Yes.
12  Q. But we are talking about your conversation
13      with Mrs. Greeley. Did you mention that
14      to Mrs. Greeley?
15  A. I basically mentioned to Mrs. Greeley that
16      this so-called St. Louis group, I felt,
17      was taking over the Chief Medical
18      Examiner's Office.
19  Q. Okay. Did you report Doctor Evans to the
20      State Ethics Commission for his
21      activities?
22  A. No, I didn't.
23  Q. Other than speaking to Mrs. Greeley and to
24      Under Secretary Hayden, did you speak to

**56**

1   anyone else regarding your concerns about
2   Doctor Evans?
3   A. Absolutely.
4   Q. At this time, at the time, around the time
5       of the end of 1997?
6   A. No. It occurs over into the 1998 time
7       frame that I am talking about.
8   Q. Okay. Go ahead. Continue.
9   A. Basically, as a role of union steward, I
10      become friendly with Jay St. Ives.
11  Q. And who is Jay St. Ives?
12  A. He was a morgue attendant downstairs. And
13      I also became friends with Erin Greeley,
14      who was Mrs. Greeley's mother. And I also
15      became friends with Derryck Sheen.
16  Q. And Sheen and Greeley were what?
17  A. They were all what they call morgue
18      attendants. Whether they were I's or
19      II's, I cannot recall.
20  Q. Okay.
21  A. But I became friendly with this group
22      because they seemed like they were
23      concerned for the public. They were
24      concerned about the wrongdoings at this

# Exhibit C

Case 1:04-cv-10508-DPW    Document 17-2    Filed 04/15/2005    Page 4 of 11

Timothy J. Manning, III - February 14, 2005    Manning and Bryson vs. Mass. OCME, et al

**Page 93**

1  know the truth.
2  Q. Okay. But just so we are clear, the truth
3     regarding this particular case is, one,
4     you don't know the name of the family?
5  A. I do not recollect the name of the family.
6  Q. Okay.
7  A. Correct.
8  Q. You do not recollect the name of the
9     individual who was deceased?
10 A. That would be the family name, wouldn't
11    it? Same name.
12 Q. It may, it may not.
13 A. Okay.
14 Q. But is that fair to say you don't?
15 A. Yes.
16 Q. Okay. You do know that it didn't happen
17    at the Chief Medical Examiner's autopsy
18    room?
19 A. I do know it was a Chief Medical
20    Examiner's case.
21 Q. You do know that it didn't happen at the
22    Chief Medical Examiner's autopsy room?
23 A. I believe it didn't. I believe it
24    happened at Boston Medical Center.

**Page 94**

1  Q. Okay. And to your knowledge, you have no
2     knowledge that Doctor Evans performed any
3     harvesting here?
4  A. I do not have knowledge.
5  Q. Okay. Or that any other forensic
6     pathologist that works for the Chief
7     Medical Examiner's Office performed any
8     harvesting of this unnamed individual?
9  A. Not that I am aware of.
10 Q. Okay. Did you call the police?
11 A. One of the things I remembered through the
12    conversation was they were going to let
13    the Attorney General's Office know.
14         Did I personally call the police,
15    no.
16 Q. Okay. Who was going to let the Attorney
17    General's Office know?
18 A. I am not sure if it was Susan Prosnitz or
19    Under Secretary Hayden.
20 Q. Okay. Now, so you didn't call the police
21    on the basis of the information that
22    Derryck Sheen gave you?
23 A. No. But I am aware that a meeting was set
24    up with him with the AG's Office.

**Page 95**

1  Q. Okay. Did you attend that meeting?
2  A. No, I didn't. I attended my own. I
3     believe he saw a Sergeant. I saw a
4     Lieutenant.
5  Q. Okay. And did Derryck Sheen tell you what
6     was the result of that meeting with the
7     Sergeant at the AG's Office?
8  A. I felt that at that time that I did
9     everything I could do and I really wasn't
10    interested.
11 Q. Excuse me. Not what you felt.
12 A. Okay.
13 Q. What did Derryck Sheen say to you happened
14    as a result of this meeting?
15 A. I didn't ask him. That was the point I
16    was trying to make.
17 Q. Okay. And did he offer?
18 A. No.
19 Q. Okay. You say you met with the Lieutenant
20    at the AG's Office?
21 A. Yes.
22 Q. What is the Lieutenant's name?
23 A. Mark Delaney.
24 Q. Mark Delaney?

**Page 96**

1  A. Yes.
2  Q. Okay. And when was this meeting with Mark
3     Delaney?
4  A. It was a few months after I met with
5     Hayden. So I would say around August,
6     September of '98.
7  Q. Okay. And what was the reason for meeting
8     with Mark Delaney?
9  A. Near the end of the meeting, in its
10    conclusion, when they were discussing, you
11    know, whether they should keep me at
12    Public Safety or send me back there, they
13    basically decided that they would send me
14    back there, I would have whistleblower's
15    status, which I never heard of before that
16    time.
17 Q. Who told you that you would have
18    whistleblower's status?
19 A. I believe it was Hayden that said he has
20    whistleblower's status.
21 Q. I am sorry. Did Hayden attend the meeting
22    with Mark Delaney?
23 A. No. I was trying to get to that point.
24    Basically, they said that the Attorney

# Exhibit D

**CONFIDENTIAL**

EXHIBIT NO. 1
2/14/05 CF

TO: Dr. Richard J. Evans, Chief Medical Examiner

FROM: Timothy J. Manning, Accounting Officer

CC: Jackie Faherty, Legal Counsel, EOPS/CME
John Cronin, Chief Administrative Officer, Budget Director
Mr. Joseph Bryson, N.A.G.E Unit 6 Shop Steward

RE: Personnel Actions/ Inactions and Labor Practices at CME

DATE: April 17, 2003

Dear Dr. Evans,

I have been asked to provide Mr. John Cronin and Mrs. Jackie Faherty through Mr. Joe Bryson written details of specific personnel issues and what I feel can be construed as unfair labor practices, that I feel need to be corrected as it relates to my current health and safety at the CME. I had hoped to meet with you to discuss these issues because they date back before my cardiac event and illness in May of 2000. I had hoped to resolve these issues before they continued to spiral out of control. I feel that your honesty and integrity and medical knowledge as it relates to stress and its effect on someone's health would result in a proactive and timely solution. I have been advised that you will not be meeting with me and this is the protocol I must follow to get closure and receive long sought explanations.

I began my career with the Commonwealth of Massachusetts and the Office of Chief Medical Examiner on February 6, 1983. I had just received my Bachelor of Science degree in Accounting and was hired as a junior accountant, working at One Ashburton Place. I have such a strong conviction to public service and my career development in government accounting that I was elected to the Finance Committee of the Town of Stoughton. I proudly served for three years with the third year being on the Public Safety Committee that resulted in both a new Police Station and a sub-station for the Fire Department. I also took and passed the Civil Service Accounting Series Exams which makes me the only civil service employee of the CME. I could have never imagined that my career ambitions and my job duties could be just arbitrarily taken away by political Appointees sent here via the Executive Office of Public Safety. For the purpose of these letter, I will not mention names, but I would be more than happy to provide details of these conversations and facts, if requested. It just happened that that these people would always be introduced as Chief Fiscal Officers, Chief Executive Officers, Chief Administrative Officers, Budget Directors and would assume job duties and responsibilities that I was providing the OCME. When these actions resulted in all my fiscal duties being taking away, without the proper job evaluation procedures (EPRS And Form 30 Process) I felt these actions were hostile in intent, and soon I felt I was working in a hostile environment.

Once these new managers arrived at the OCME, they would bring other friends that could be considered part of their regime or group. When these people were approached by myself, regarding questionable accounting practices and payroll data, I soon became a target. It was not unusual to come to work and find my belongings, some

personal such as family pictures, moved to another location in this building. This happened on at least three occasions. I was physically moved out of the Fiscal Department and would soon have all my Fiscal access via the computer MMARS/ PMIS deactivated. I was definitely a target and can not describe to you what stress I went through on a daily basis. It was also at this time Dr. Evans that I felt that you had written my career off. Soon e-mails to you would go unanswered and all communication with you would come to a grinding halt.

I would soon find myself, sitting in a storage area with slides and would soon experience depression, loneliness, hopelessness, and anxiety attacks. My career and family were too important to let this happen. I became Unit 6 N.A.G.E. shop steward and began to learn some employment laws. It was soon thereafter that I received a telephone call from EOPS asking if I was leaving the OCME and was surprised that I was still there since they could not contact me. I had let them know that my mail was being opened by the new Management team and I was moved and would soon have a telephone and if I was good and lucky my own extension. I expressed to them that I was working on special projects and actually told that I did not even have to show up for work and I would still be paid. I showed up because I felt that these managers were deceiving and I didn't want to give them a reason to fire me. I asked them about telecommuting since this was a possibility discussed by Dr. Evans. EOPS had told me that they were calling because there was an Accountant V position at the OCME, posted on the internet. I told them that it was not posted at our agency and I couldn't believe that I was only an Accountant IV and had done those duties about twice a week. It was at this time I gave EOPS permission to contact me at home. I would also apply for this Accountant V position and was given both a written exam and essay question that I had to respond to on the computer. I never received any response back from the interviewer or agency and found no record of this test in my personnel folder. Needless to say Dr. Evans I didn't receive the upgrade and am still being paid as an Accountant IV today, while both the other Fiscal people at the agency are Accountant V's. I would soon be contacted by EOPS, and asked to appear downtown, which I obliged. I was then contacted by the Attorney General's Office and a meeting was set up at there office, which I obliged. It is at this point Dr. Evans that I am officially notifying you I was granted "Whistleblowers Protection". I am sure that you were already made aware of this fact. Soon this agency would make drastic changes. In June of 1999, Chief of Staff informs me that as of July 1, 1999 I was being promoted to Chief Fiscal Officer replacing the employee that was fired. I gladly received my access back and completed her duties as CFO. Unfortunately, as of this date I still have not received the compensation that I am entitled.

Although I was Chief Fiscal Officer, I felt that having no communication with the Chief Medical Examiner, and having no staff, and not receiving the additional pay, and realizing that this same group was still present, it was time to take flight. In June of 2000, I was selected for a position at the Comptroller's of the Commonwealth. In May I left a package on your door that detailed what the difference in salary was between what I was receiving and should have been receiving from doing work in a higher job classification. I have still not received a response. Then it happened, during work on a Friday afternoon, I had just had an argument with a doctor about taking the state car he felt was his to get the paychecks. On returning to work I felt like I was going to die and almost did when

my heart stopped beating. I notified Management and you by e-mail and was shocked that I was told I was faking. Could you please produce this e-mail, Dr. Evans, or the package that was left on your door? I left work and was being operated on that night. I still wonder Dr. Evans, could I have been poisoned, or could I have caught this disease from airborne exposure in the autopsy areas, that even today the cause is not known?

The following is a chronology of events since May 2000:

1) No communication from yourself regarding my health or my concerns about returning to work except a approved "Medical Leave of Absence."
2) One day pay refused for mandatory reporting to jury duty.
3) Realize that my credit is ruined due to being a victim of identity theft. I still remember having both grandmothers' dying within a week of each other and returning from bereavement leave only to find my desk and office has been moved. It didn't take a genius to figure out my mother's maiden name, when both obituaries appeared in the Boston papers. This is being mentioned here because of the memo issued from you in regards to this issue.
4) Industrial Accident denied by OCME, please explain why?
5) A 1991 junior accountant Form 30 faxed from this agency to ITT Hartford that immediately halts my Long Term Disability payments. Can't find this in my personnel file or who faxed this.
6) Return to work on April 1, 2002.
7) Payroll Clerk has changed History such as date of entry into the State and Date of Hire from 2/06/1983 to 04/01/1984.
8) Never received 2% NAGE increases in either January 2002 or January 2003.
9) On the second paycheck I receive from OCME, the Payroll Clerk deletes all my vacation and sick leave that was accrued while I was on an approved medical leave of absence that resulted in hospitalization. I am requesting immediate restoration.
10) I discover that I am not an Accountant VI but an Accountant IV. Please adjust my position accordingly. Please see letter of Donna Mulaney.
11) I should be on a 25 day vacation accrual and not a 20 day, since I have been with the Commonwealth more than 19.5 years. Please adjust and change this status.
12) Last paycheck received, deducted $21.50 out of my gross wages as negative additional income. The Payroll Clerk states this is for having my paycheck federally expressed to Florida. I asked if this would be appropriate and would not have had it sent this way if I was told this was inappropriate. I have examined all GAAP procedures and am confused how anyone could deduct an expense from a Gross Wage Income item. Please adjust and if this is a problem, please bill me and I will issue the OCME a check.

I hope that this letter will open the line of communications and will be addressed promptly in a manner that is beneficial for both the OCME and my health and well being. All I ever expected was to be treated equally and fairly and not treated differently than other employees at the OCME.

I really enjoyed working with the last Budget Director because he treated everyone professionally and fairly. His replacement has already told me that I am no longer going to be involved with Budgets, even though I prepared the last one and responses to both HWM and SWM. The new Chief Administrative Officer

has told me he wants my EPRS and Form 30 "by the end of the day", and he would like me to learn 4NSYS. Does this treatment sound familiar? Would you feel like a target? I am still reporting to a Lieutenant in the State Police, and I think an Organizational Chart would also be very beneficial. I would appreciate if a complete review of my salary structure and increments can be done from an independent source such as HRD. I would greatly appreciate any assistance you can offer regarding an updated Form 30 and a completed EPRS form. Thank you for addressing my situation.

Sincerely,


Timothy J. Manning
Accounting Officer

# Exhibit E

Case 1:04-cv-10508-DPW   Document 17-2   Filed 04/15/2005   Page 11 of 11

Timothy J. Manning, III - February 14, 2005
Manning and Bryson vs. Mass. OCME, et al

**Page 141**

1  appropriation, it was put in writing.
2  Q. Okay.
3  A. I mean on several occasions, we are taking
4  another ten percent. Do you know what I
5  mean? We will take another five percent.
6  It was common sense that there was no
7  attention to details, so to speak, saying
8  that, Well, we can only take in the
9  language 25 percent of her salary but we
10 have already taken 65. There was never
11 any correlation that was made between the
12 two, between what was written or
13 assumingly written and what was actually
14 taken.
15     And there was also a point that
16 we needed more money, where are we going
17 to go get it. And I was in on those
18 meetings.
19 Q. Okay. So just so I am clear, in the
20 course of those meetings you are saying
21 that the numbers attributed or the monies
22 attributed for federal work given in
23 salaries to state employees was not
24 accurate?

**Page 142**

1  A. I don't believe so. I believe it was
2  arbitrarily based on how much money we
3  needed to balance the budget so to speak.
4  Q. Okay. In its inaccuracy, was it
5  inaccurate in amount or was it inaccurate
6  by the fact that these individuals weren't
7  doing anything that would come under the
8  federal grant?
9  A. My perception would be the amount as if
10 our -- who was okay'd to get paid out of
11 that grant.
12 Q. Okay. Anything else that you brought up
13 with Under Secretary Hayden?
14 A. That was basically it.
15 Q. Okay. Now, when you mentioned I think you
16 used the term "misuse" of federal grant
17 funds --
18 A. Yes.
19 Q. Okay. Did you go to anyone other than
20 Under Secretary Hayden regarding that?
21 A. As I mentioned a little bit earlier, I
22 went to Dr. Ann Marie Mires, who was, had
23 some experience with the grant writings.
24 Q. Yes.

Carol A. Fierimonte, CSR  (781) 762-4421

**Page 143**

1  A. And my opinion is she basically expressed
2  the same concerns that I had.
3  Q. Okay.
4  A. About the grants.
5  Q. And what did she do to follow-up on it?
6  A. I put a memo together to Doctor Evans
7  dated April 17, 2003.
8  Q. Okay.
9  A. Basically, telling him that I felt that
10 these issues haven't been addressed. The
11 same regime, I used, was still in control.
12 That --
13 Q. How is that how Doctor Mires followed up
14 on it?
15 A. No, I thought you said how did I.
16 Q. No. How did Doctor Mires follow-up on the
17 misuse of grant funds, if you know?
18 A. You would have to talk to Doctor Mires.
19 Q. So to your knowledge, you have no idea how
20 it was followed up by her?
21 A. No, I don't.
22 Q. Okay. And you are saying that you
23 followed up by a letter to Doctor Evans?
24 A. Yes.

**Page 144**

1  Q. Was it a letter?
2  A. It was a letter, yes. I believe I sent it
3  and I e-mailed it, I believe, to Jackie.
4  Q. What is the date of the letter again?
5  A. 4/17/2003.
6  Q. Okay.
7  A. And we met on May 14, 2003, to discuss it,
8  a three-hour meeting.
9  Q. Okay. I am going to show you this
10 document here. I am also going to give a
11 copy to your counsel.
12 A. Yes.
13     MS. FRANKL: Thank you.
14 Q. And I am going to ask you if you recognize
15 this document.
16 A. Yes. This is the one I talked to you
17 about, April 17th.
18     MS. O'NEIL: Okay. Can we have
19 this one marked as Exhibit No. 1, please.
20     (Document marked as Exhibit No. 1
21 for identification.)
22 Q. This particular letter, I am sorry, you're
23 saying was what?
24 A. You know, basically, the same people were