# Exhibit G

Case 1:04-cv-10508-DPW    Document 17-4    Filed 04/15/2005    Page 2 of 19

Timothy J. Manning, III - February 14, 2005    Manning and Bryson vs. Mass. OCME, et al

Page 157

1  you do?
2  A. In response to that, going to the union
3     process, I felt that I needed to talk to
4     an employment lawyer too. And that is why
5     I contacted my attorney.
6  Q. Okay.
7  A. My current attorney.
8  Q. So just if I might, do you recognize this
9     document here?
10 A. Okay. It looks familiar.
11 Q. Okay.
12 A. I know my name is on it.
13 Q. Is your signature on it as well?
14 A. No. My signature is not on it.
15 Q. Okay. But you do recognize the document?
16 A. Well, I recognize this as being a standard
17    contract. I see my name is on it. I
18    don't know what it is for.
19 Q. You don't believe that to be your
20    employment contract?
21 A. No. It is Robert Wright's contract.
22 Q. Excuse me one second. Sorry about that.
23    You are exactly right. Excuse me. I am
24    sorry. I put the wrong one in. I take

Page 158

1  that back.
2  A. I am sorry. I never signed a contract.
3  Q. My mistake.
4  A. Okay.
5  Q. Well, then is it fair to say that your
6     employment when you were employed at the
7     OCME was covered by the CBA for Unit 6 of
8     NAGE?
9  A. Supposedly.
10 Q. Supposedly. What do you mean? Weren't
11    you a union member?
12 A. I would say yes then.
13 Q. Okay. Fair enough. All right.
14       Now, apart from that, if I might,
15    you know, let's see if we are clear here.
16    Did you in writing notify your employer
17    that you were going to be filing suit
18    against them for your whistleblower
19    claims?
20 A. I notified my employer through this memo
21    and subsequent, subsequent e-mails.
22 Q. Yes.
23 A. That I felt that my whistleblower status
24    was being challenged illegally.

Page 159

1  Q. That your whistleblower status, so you are
2     saying that Exhibit No. 1 --
3  A. Yes.
4  Q. -- constitutes notice of a suit for
5     whistleblower status?
6  A. It constitutes that I am going to do
7     something about the whistleblower's
8     challenge, yes.
9  Q. Okay. Now, I am going to show you now an
10    exhibit which we will mark as Exhibit No.
11    2, which is an e-mail from Joe Bryson that
12    has as part of the e-mail trail an e-mail
13    from yourself.
14       Do you recognize that e-mail?
15       (Witness perusing document.)
16 A. It looks like it was to me from Jackie.
17 Q. Keep going.
18 A. Is that to Evans? Yes, I have seen this
19    before. I have, yes.
20       MS. O'NEIL: Okay. If we might,
21    can we mark this as Exhibit No. 2, please.
22       (Document marked as Exhibit No. 2
23    for identification.)
24 Q. Have you had an opportunity to look at it

Page 160

1  more closely?
2     (Witness perusing document.)
3  A. Yes.
4  Q. Now, you mentioned e-mails that you say
5     notified your employer about your
6     whistleblower claim.
7  A. Right.
8  Q. Do you state that this particular e-mail
9     does that, Exhibit No. 2?
10 A. This, the purpose of this e-mail --
11 Q. Yes.
12 A. Was, I believe, another form of
13    retaliation, was John Cronin basically
14    gave me an EPRS form and a new Form 30.
15 Q. Okay.
16 A. Okay. And told me by the end of the day
17    that I better have this filled out.
18 Q. Okay.
19 A. So basically, I told him that a Form 30 is
20    pretty much a job description from NAGE
21    through the collective bargaining. An
22    EPRS form to be filled out in the middle
23    of a year would totally defeat the
24    purpose. An EPRS form is an evaluation

Case 1:04-cv-10508-DPW   Document 17-4   Filed 04/15/2005   Page 3 of 19

Timothy J. Manning, III - February 14, 2005                Manning and Bryson vs. Mass. OCME, et al

Page 161

```
 1      for a whole year.
 2   Q. Okay.
 3   A. And basically, that I felt because of the
 4      history of trying to get these issues
 5      answered through Jackie Faherty, that she
 6      would be able to let him know or Doctor
 7      Evans know if he didn't already know that
 8      this was a very unfair thing to ask.
 9   Q. Okay. I am not -- just so I am clear and
10      concise here.
11   A. Okay.
12   Q. What I am going to ask you or what I am
13      asking and what I am going to continue to
14      ask you is for you to identify which of
15      these writings that you state constitute
16      your notice to your employer that you are
17      going to bring a whistleblower's suit.
18      That is all I am asking.
19   A. Okay.
20   Q. So for instance, Exhibit No. 1, is that
21      your notice that you are saying --
22   A. Yes. It specifically says whistleblowing
23      and that I am going to look into my
24      options with regard to whistleblowing.
```

Page 162

```
 1   Q. All right. So you are saying that
 2      constitutes -- I am sorry?
 3   A. Regarding the whistleblowing.
 4   Q. So you are saying that that constitutes
 5      notice that you are going to be bringing a
 6      whistleblower lawsuit to your employer?
 7   A. It constitutes that that would be one of
 8      the possibilities.
 9   Q. Okay. Exhibit No. 2, how would you
10      characterize that document?
11   A. I would characterize it that I felt that I
12      was being retaliated by John Cronin and my
13      fears were being confirmed.
14   Q. Okay. Would you also characterize that as
15      an example of notice that you sent to your
16      employer regarding your whistleblower
17      claim?
18   A. It would also basically discuss the
19      hostile intentions, that I wanted this
20      more or less answered more as a concern to
21      my health also.
22   Q. Okay. Yes or no, if you could. Is it
23      notice in your mind?
24   A. Can you tell me what the legal definition
```

Page 163

```
 1      of notice would be?
 2   Q. Okay. Is it a written notification to
 3      your employer that you are filing a
 4      lawsuit for your whistleblower claims.
 5   A. I believe that it is evident that it shows
 6      that this is a strong possibility that
 7      this, this could be a ramification --
 8   Q. So that would be a yes?
 9   A. I would say it is a maybe.
10   Q. A maybe. Okay. I would like to show you
11      this third exhibit, please. There won't
12      be many.
13   A. Okay.
14   Q. Do you recognize that exhibit?
15          (Witness perusing document.)
16   A. Yes.
17   Q. Okay.
18   A. It is basically almost the same thing as
19      this one.
20   Q. Now, what do you recognize it as, sir?
21   A. I recognize that as a message to Doctor
22      Evans, Jackie and whoever, Jackie
23      Faherty's and whoever's concern that I
24      feel like I am being retaliated against
```

Page 164

```
 1      because of my whistleblowing.
 2          MS. O'NEIL: Okay. Can we have
 3      this marked as Exhibit No. 3, please.
 4          (Document marked as Exhibit No. 3
 5      for identification.)
 6   Q. And I am going to ask you regarding
 7      Exhibit No. 3, do you say that constitutes
 8      notice to your employer that you are going
 9      to be filing a whistleblower lawsuit?
10          (Witness perusing document.)
11          MS. FRANKL: Just three. She is
12      just asking you a question about just
13      about Exhibit No. 3.
14          THE WITNESS: Oh, this one?
15          MS. O'NEIL: Yes.
16          (Witness perusing document.)
17   A. My response would be the same as it was
18      for -- it seems like it was the same
19      action that caused both of these e-mails
20      to be written.
21   Q. Okay. So your response would be maybe as
22      well?
23   A. Yes.
24   Q. Okay. Now, I am going to show you this
```

Case 1:04-cv-10508-DPW   Document 17-4   Filed 04/15/2005   Page 4 of 19

Timothy J. Manning, III - February 14, 2005          Manning and Bryson vs. Mass. OCME, et al

Page 165

```
 1    document as well. And can you take a look
 2    at it and see if you recognize it.
 3         (Witness perusing document.)
 4  A. I think this is a little bit more clearer
 5    that that shows that --
 6  Q. Well, just do you recognize it?
 7  A. Yes, I do.
 8         MS. O'NEIL: Okay. Can we have
 9    this marked as Exhibit No. 4 then, please.
10         (Document marked as Exhibit No. 4
11    for identification.)
12  Q. And Mr. Manning, what do you recognize
13    Exhibit No. 4 to be?
14  A. I believe this is another request for help
15    that I really hoped that these issues
16    could be dealt amicably and, basically,
17    let them know that I would have to fight
18    these actions. And I wasn't sure at this
19    time which avenue I should pursue, whether
20    it would be the Americans With
21    Disabilities Act or the whistleblower's
22    from before.
23  Q. So to ask regarding Exhibit No. 4, are you
24    saying that constitutes notice to your
```

Page 166

```
 1    employer that you were going to be filing
 2    a whistleblower lawsuit?
 3  A. It definitely gives them notice that I am
 4    going to look into all the possibilities.
 5  Q. So would this be a maybe also?
 6  A. I believe this is a yes, that it shows
 7    that I am not ruling out prospective legal
 8    action.
 9  Q. Okay. Now, if I might, sir, I am going to
10    show you a further document and ask if you
11    recognize this one as well.
12         (Witness perusing document.)
13  A. Yes. This looks familiar.
14  Q. Okay.
15  A. Yes.
16         MS. O'NEIL: Can we have this
17    marked as Exhibit No. 5, please.
18         (Document marked as Exhibit No. 5
19    for identification.)
20  Q. And sir, what do you recognize Exhibit No.
21    5 to be?
22         (Witness perusing document.)
23  A. Exhibit No. 5 is more or less a time line.
24    It is now May 22nd and I feel that the
```

Page 167

```
 1    letter of April 17th still hasn't been
 2    addressed.
 3  Q. And does this exhibit constitute, Exhibit
 4    No. 5 constitutes notice?
 5  A. I don't think this one does.
 6  Q. Okay. I am going to show you the second
 7    to last exhibit and ask you if you
 8    recognize that document, sir.
 9         (Witness perusing document.)
10  A. Yes. This basically details that I was
11    looking into the specifics of the
12    Whistleblower's Act.
13         MS. O'NEIL: Okay. Let's see if
14    we can have this marked as Exhibit No. 6,
15    please.
16         (Document marked as Exhibit No. 6
17    for identification.)
18  Q. Now, regarding Exhibit No. 6, sir, do you
19    say that constitutes notice to your
20    employer of an impending whistleblower
21    lawsuit?
22  A. It absolutely shows that where it says in
23    the sentence right here, "I was not 100
24    percent sure of all the legal details of
```

Page 168

```
 1    the Whistleblower's Act."
 2  Q. Mm-hmm.
 3  A. So basically, it shows that I feel that my
 4    rights are being violated.
 5  Q. Okay. But do you say that constitutes
 6    notice to your employer of an impending
 7    whistleblower lawsuit?
 8  A. Well, when you use the word "impending",
 9    can I change that to the possibility that
10    that is a possibility as impending?
11         MS. FRANKL: You can't change her
12    questions, Tim.
13         THE WITNESS: I am sorry.
14         MS. FRANKL: You just answer her
15    questions.
16         MS. O'NEIL: Right. Answer it as
17    best you can.
18         THE WITNESS: I am sorry.
19  A. I believe it shows that there is a
20    possibility that there will be a
21    whistleblower's action.
22  Q. Okay. So it shows a possibility?
23  A. A possibility.
24  Q. Okay. And lastly --
```

Case 1:04-cv-10508-DPW   Document 17-4   Filed 04/15/2005   Page 5 of 19

Timothy J. Manning, III - February 14, 2005                Manning and Bryson vs. Mass. OCME, et al

**165**

1  document as well. And can you take a look
2  at it and see if you recognize it.
3       (Witness perusing document.)
4  A. I think this is a little bit more clearer
5  that that shows that --
6  Q. Well, just do you recognize it?
7  A. Yes, I do.
8       MS. O'NEIL: Okay. Can we have
9  this marked as Exhibit No. 4 then, please.
10      (Document marked as Exhibit No. 4
11 for identification.)
12 Q. And Mr. Manning, what do you recognize
13 Exhibit No. 4 to be?
14 A. I believe this is another request for help
15 that I really hoped that these issues
16 could be dealt amicably and, basically,
17 let them know that I would have to fight
18 these actions. And I wasn't sure at this
19 time which avenue I should pursue, whether
20 it would be the Americans With
21 Disabilities Act or the whistleblower's
22 from before.
23 Q. So to ask regarding Exhibit No. 4, are you
24 saying that constitutes notice to your

**166**

1  employer that you were going to be filing
2  a whistleblower lawsuit?
3  A. It definitely gives them notice that I am
4  going to look into all the possibilities.
5  Q. So would this be a maybe also?
6  A. I believe this is a yes, that it shows
7  that I am not ruling out prospective legal
8  action.
9  Q. Okay. Now, if I might, sir, I am going to
10 show you a further document and ask if you
11 recognize this one as well.
12      (Witness perusing document.)
13 A. Yes. This looks familiar.
14 Q. Okay.
15 A. Yes.
16      MS. O'NEIL: Can we have this
17 marked as Exhibit No. 5, please.
18      (Document marked as Exhibit No. 5
19 for identification.)
20 Q. And sir, what do you recognize Exhibit No.
21 5 to be?
22      (Witness perusing document.)
23 A. Exhibit No. 5 is more or less a time line.
24 It is now May 22nd and I feel that the

**167**

1  letter of April 17th still hasn't been
2  addressed.
3  Q. And does this exhibit constitute, Exhibit
4  No. 5 constitutes notice?
5  A. I don't think this one does.
6  Q. Okay. I am going to show you the second
7  to last exhibit and ask you if you
8  recognize that document, sir.
9       (Witness perusing document.)
10 A. Yes. This basically details that I was
11 looking into the specifics of the
12 Whistleblower's Act.
13      MS. O'NEIL: Okay. Let's see if
14 we can have this marked as Exhibit No. 6,
15 please.
16      (Document marked as Exhibit No. 6
17 for identification.)
18 Q. Now, regarding Exhibit No. 6, sir, do you
19 say that constitutes notice to your
20 employer of an impending whistleblower
21 lawsuit?
22 A. It absolutely shows that where it says in
23 the sentence right here, "I was not 100
24 percent sure of all the legal details of

**168**

1  the Whistleblower's Act."
2  Q. Mm-hmm.
3  A. So basically, it shows that I feel that my
4  rights are being violated.
5  Q. Okay. But do you say that constitutes
6  notice to your employer of an impending
7  whistleblower lawsuit?
8  A. Well, when you use the word "impending",
9  can I change that to the possibility that
10 that is a possibility as impending?
11      MS. FRANKL: You can't change her
12 questions, Tim.
13      THE WITNESS: I am sorry.
14      MS. FRANKL: You just answer her
15 questions.
16      MS. O'NEIL: Right. Answer it as
17 best you can.
18      THE WITNESS: I am sorry.
19 A. I believe it shows that there is a
20 possibility that there will be a
21 whistleblower's action.
22 Q. Okay. So it shows a possibility?
23 A. A possibility.
24 Q. Okay. And lastly --

Case 1:04-cv-10508-DPW   Document 17-4   Filed 04/15/2005   Page 6 of 19

Timothy J. Manning, III - February 14, 2005   Manning and Bryson vs. Mass. OCME, et al

Page 169

1  A. Yes.
2  Q. Go ahead.
3  A. Okay.
4  Q. And lastly, I show you this document, sir. And do you recognize it?
6     (Witness perusing document.)
7  A. Yes, I do recognize it.
8     MS. O'NEIL: Okay. Can we have this marked as Exhibit No. 7.
10    (Document marked as Exhibit No. 7 for identification.)
12 Q. And I will ask you the question a final time regarding the final exhibit. Does this constitute in your mind notice to your employer that you are going to file suit under the Whistleblower Act?
17 A. No. This was dated April 3, 2003, before the meeting.
19 Q. Okay. Do you have -- do you have a memory of any particular document in which you notified your employer that you were filing the lawsuit for whistleblower status or the Whistleblower Act? Excuse me.

Page 170

1  A. I believe the documents would be the letters and e-mails.
3  Q. Okay.
4  A. And the meeting with legal counsel being present.
6  Q. Okay. Well, I am talking about in writing now, sir.
8  A. Again, I would refer to the e-mails and the letters.
10 Q. Okay. The exhibits?
11 A. Typewritten, yes.
12 Q. The exhibits that have been put before you?
14 A. Correct.
15 Q. Okay. Now --
16 A. The ones I answered yes to or probably.
17 Q. Okay. Very good. I am going to ask you this. Just if you would, what issues of public interest do you say you were bringing up regarding your whistleblower claim?
22 A. The misuse of federal funds.
23 Q. Mm-hmm. And what was that, do you know what the result of that claim was about

Page 171

1     the misuse of federal funds?
2  A. There was an audit recently done on one of the grants in one of the fiscal years and they concurred that in their opinion that there were total irregularities.
6  Q. Total irregularities?
7  A. Yes.
8  Q. What do you mean by that?
9  A. Basically, they found a lot of findings with the way they were handled and with this group, either Crest or Best, getting all the contracts.
13 Q. And do you know if there was any penalty for this?
15 A. I haven't checked into it. I don't know one way or the other. It was sent to me by e-mail in, I believe, August or September. And I could provide you with a copy if you would like.
20 Q. Well, you can talk to your counsel on that.
22 A. Okay.
23 Q. All right. So in terms of the public interest, it was the fact -- it was the

Page 172

1     audit of federal funds?
2  A. Yes.
3  Q. And result of that audit is known that there were findings, but you don't know what resulted from the findings?
6  A. Correct. The findings agreed to what my concerns were about the misuse of funds.
8  Q. Okay.
9  A. With the group, same group of consultants getting work. As a matter of fact, the Medical Examiner is one of the agencies they looked at. And they came to the same negative conclusions.
14 Q. I am sorry. This audit of federal funds was not an audit of federal funds specifically for the Office of the Chief Medical Examiner?
18 A. That was one of the agencies they looked at.
20 Q. So this was an audit of several agencies in the Executive Office of Public Safety?
22 A. It was actually, I believe, four towns and the Office of Chief Medical Examiner. I believe there was five areas they looked

# Exhibit H

CONFIDENTIAL

## Bryson, Joe (CME)

**From:** Faherty, Jackie (CME)
**Sent:** Tuesday, April 08, 2003 8:55 AM
**To:** Manning, Timothy (CME); Evans, Richard (CME)
**Cc:** Bryson, Joe (CME)
**Subject:** RE: Salary Issue/ Form 30 Job Description

EXHIBIT
NO. 2
2/14/05   CF

Tim,
I would be happy to speak with you about your concerns. I will be out of the office most of today. Would you like to talk tomorrow mid-morning?

-----Original Message-----
**From:** Manning, Timothy (CME)
**Sent:** Monday, April 07, 2003 4:40 PM
**To:** Evans, Richard (CME)
**Cc:** Faherty, Jackie (CME); Bryson, Joe (CME)
**Subject:** Salary Issue/ Form 30 Job Description

Dear Dr. Evans,
   Last week I asked to meet with you regarding several personnel issues, and also asked if you would kindly verify that you received that communication. I was also asked by John Cronin to immediately fill out an EPRS form with a new form 30. I have not received any response from you. I have made myself available late at night and have also requested to meet you at your earliest convenience, even if this was during non-scheduled work hours. This continued unresponsiveness has caused personal discomfort and stress.
   As discussed with both Jackie and Joe, I believe that these numerous issues can be discussed amicably, and I am requesting immediate closure. The status quo does not make much sense, and I am beginning to believe that these acts and errors may have hostile intentions. Could you please meet with me and I will provide a detailed breakdown of these issues, i.e. my date of hire and date of entry into the State changed in my history.
   Thank you.
   Tim Manning

4/8/2003



**Bryson, Joe (CME)**

| | |
|---|---|
| From: | Manning, Timothy (CME) |
| Sent: | Thursday, April 03, 2003 10:22 AM |
| To: | Evans, Richard (CME); Faherty, Jackie (CME); Platt, Edith (CME) |
| Cc: | Bryson, Joe (CME) |
| Subject: | EPRS |



I felt that I was a target before I wrote that letter, but now I am convinced. At approximately 10:05 John Cronin needed to get my EPRS downtown, today! Guess timing is everything in life. I think you will all agree that the current cloud of uncertainty regarding these issues. Not only does the job description need to be addressed, but I was still under the impression that Lt. Platt was my supervisor. Please clarify these issues so I can honor John Cronin's request.
Thank You
Tim

7/7/2003



CONFIDENTIAL

EXHIBIT NO. 4
2/14/05  CF

**Bryson, Joe (CME)**

---

**From:** Cronin, John (CME)
**Sent:** Tuesday, May 13, 2003 3:26 PM
**To:** Manning, Timothy (CME); Faherty, Jackie (CME)
**Cc:** Evans, Richard (CME); Bryson, Joe (CME)
**Subject:** RE: Telephone Conversation

Tim, Jackie and I would like to meet with you tomorrow morning at 10:00AM to discuss your concerns. Please confirm your availability.

-----Original Message-----
**From:** Manning, Timothy (CME)
**Sent:** Tuesday, May 13, 2003 2:30 PM
**To:** Faherty, Jackie (CME)
**Cc:** Cronin, John (CME); Evans, Richard (CME); Bryson, Joe (CME)
**Subject:** Telephone Conversation

Jackie-

This correspondence is to acknowledge today's telephone conversation. It appears that the immediacy of my personnel issues, per attached memo to Dr. Richard Evans, as they pertain to both my career and health are not a priority as of now. I was informed that you were going to check with John Cronin about the status.

I am confused because correspondence from Mr. John Cronin ( 4/30/2003 @ 9:36a.m.) stated that you and John were "currently reviewing your personnel file". Also, Mr. John Cronin in his correspondence ( 4/17/2003 @ 5:10 p.m.) states "we'll discuss other project options that make use of your skills in finance", referring to my budget duties arbitrarily being taken away. But most importantly your correspondence sent to Mr. Joe Bryson and myself ( 4/08/2003 @ 11:48a.m.) stating "I would be happy to meet next week as well". This memo is also meant to document that absolutely nothing has taken place as indicated, including my request of certain documents from my personnel file (reviewed in your presence on 2/11/2003 ). I believe the status-quo is not an acceptable solution when it comes to someone's career , mental and physical health.

I am disappointed that you are familiar with the Massachusetts Labor Laws, Federal Laws as they relate to "Family and Medical Leave Act (FMLA) , The American With Disabilities Act ( ADA), yet these issues continue to be ignored by requests sent via correspondence to Dr Evans, John Cronin and yourself. I hoped that this management team would understand how serious these issues are. This is the reason in this conversation I have asked whom is in charge of this agency at EOPS, and if I had the right to make them aware of this situation. Your response was Robert Haas, and I had a right to do anything I wanted.

Again, I am stating that this hostility and isolationism are adversely affecting my health. I am also requesting that Mr. Robert Haas receive all correspondence of this very serious matter.
Thank you,

TIM

7/7/2003

# Exhibit I

Case 1:04-cv-10508-DPW   Document 17-4   Filed 04/15/2005   Page 12 of 19

Timothy J. Manning, III - February 14, 2005    Manning and Bryson vs. Mass. OCME, et al

Page 73

1  Q. Oh, it is into 1998?
2  A. See, 1997, I basically decide, you know,
3     when I come back from my leave, I run in
4     the hallway into Mark Fairbank and Doctor
5     Evans. "Oh, you've been moved."
6            And I got upset because my
7     personal things were moved too, my
8     pictures of my children. And I basically
9     said, you know, they had talked to me
10    about telecommuting, working at home.
11 Q. They offered that to you?
12 A. They wanted to offer that to every,
13    everybody at the agency.
14 Q. And so it would be available to you?
15 A. They were working on that. They basically
16    told me I would be doing special projects.
17    And I actually went out and, for instance,
18    the new vehicles that they have also with
19    federal money, the Mass. Disaster
20    vehicles, I remember going to Rhode Island
21    on a project to get the specs for those.
22 Q. Okay. Well, you mentioned the new
23    vehicles, Mass. Disaster vehicles.
24           Those are the SUV's you are

Page 74

1     talking about, aren't they?
2  A. No. They also got huge they're like
3     refrigerator trucks that are parked.
4  Q. Did they arrive at the same time as the
5     SUV's?
6  A. No. Later. At a later date.
7            But anyways, in this room, you
8     know, I had finally, you know, realized
9     that when they told me that basically they
10    would give me a project and, you know,
11    tell me, Well, you didn't have to show up
12    to work the next day, or whatever like
13    that, I just became kind of suspicious of
14    their intentions.
15 Q. So when you returned from bereavement
16    leave --
17 A. Correct.
18 Q. You realized that your office had been
19    moved?
20 A. Moved, I was like -- I run into Doctor
21    Evans and Mark Fairbank. And Mark had a
22    big smile on his face and said, "You're
23    going to be sitting here."
24           And this is just space, it is

Page 75

1     down here to the right that was just like
2     slide tissues. It was like a dump. It
3     looks pretty nice now, but at that time it
4     was a dump.
5  Q. So that upset you?
6  A. Yes, it did.
7  Q. Okay. And in response to that, what did
8     you do?
9  A. When I got in touch with -- I talked to
10    Mrs. Greeley. And Greeley --
11 Q. Yes?
12 A. In the meantime, the techs had found out
13    that I was pretty upset and they were
14    giving me information that was pretty
15    unbelievable as far as we already talked.
16    I think that the word they used is
17    pericardium, that pericardium was being
18    taken without permission, without the
19    knowledge of the families.
20 Q. And what families had loved ones whose
21    pericardium was taken, harvested
22    inappropriately?
23 A. Their assumptions were that it was being
24    taken in a random basis; that because

Page 76

1     people weren't watching, they were taking
2     it.
3  Q. So they couldn't name a single corpse that
4     had the pericardium taken?
5  A. There is a single event that Derryck Sheen
6     brings to my attention that a friend of
7     his was riding his bicycle in Boston and
8     had an accident. And the family was up on
9     their way from I am not sure if it was
10    Puerto Rico, Haiti or whatever. And he
11    was on life support. And by the time they
12    got there, his organs were already
13    harvested.
14           And when I told, when I met with
15    Hayden in 1998, he basically wanted to
16    meet with Derryck Sheen.
17 Q. Okay.
18 A. So I arranged that.
19 Q. Did that meeting go forward?
20 A. We met at Linda Mae's. It was Susan
21    Prosnitz, myself, Derryck Sheen, and Bob
22    Hayden, Under Secretary Hayden. And they
23    had suggested we meet at Linda Mae's. I
24    don't -- I believe it is closed now -- in

# Exhibit J

Case 1:04-cv-10508-DPW    Document 17-4    Filed 04/15/2005    Page 14 of 19

Timothy J. Manning, III - February 14, 2005                    Manning and Bryson vs. Mass. OCME, et al

**Page 89**

1  A. It eventually would. I am not sure at the
2     time that they were still Unit 1's. But
3     basically, it is a very -- when there is
4     only a few employees in an agency, I mean
5     you hear about a lot of people's
6     complaints, you know, whether they have
7     only got 15 minutes for lunch or 55
8     minutes for lunch or whatever the case may
9     be. So it was to everyone's best
10    interests down there to let everyone know
11    what was going on.
12 Q. When you say it was to everyone's best
13    interests, who are you referring to?
14 A. To the employees. Their main concern --
15 Q. Okay.
16 A. To the employees.
17 Q. Okay. Well, just so I am clear because we
18    seem to be putting two issues together --
19 A. Okay.
20 Q. And connecting them with TBI.
21 A. Okay.
22 Q. The one issue, though, regarding this
23    organ harvesting that you speak of, which
24    sounds horrific, that wasn't Doctor Evans?

**Page 90**

1     He did not perform the -- he did not --
2     excuse me. I am trying to think of the
3     word.
4         He didn't practice at Boston
5     Medical?
6  A. He didn't practice at Boston Medical, but
7     it was my information at that time that
8     there had to be a Medical Examiner or
9     Chief Medical Examiner or whatever to give
10    the okay for the harvest.
11 Q. Okay.
12 A. I mean because a lot of times --
13 Q. Well, do you know the procedure for a
14    Chief Medical Examiner to okay a
15    harvesting?
16 A. One of the things that was talked about a
17    lot was whether the Attorney General's
18    Office was going to be involved.
19 Q. Okay.
20 A. I mean whether there could be a case.
21 Q. That is okay. Let's go to the procedures
22    now.
23 A. Okay.
24 Q. As I understand it, what are the

**Page 91**

1     procedures when an individual is on life
2     support at Boston Medical Center, what
3     does the Chief Medical Examiner do in that
4     circumstance?
5  A. Assume that they are deceased now. The
6     Medical Examiner would get a phone call,
7     basically, with the intentions of getting;
8     A, to see if, A, it had to be autopsied;
9     or B, could just be viewed; or C, if the
10    family doctor could sign off on the death.
11    So they have a list of criteria that,
12    basically, it gives different examples of
13    which cases always have to be autopsied or
14    which cases didn't need to be autopsied.
15 Q. And who would call the Medical Examiner
16    with this information?
17 A. I believe it would be the doctor that was
18    involved, the treating, the doctor
19    involved in treating the patient.
20 Q. Okay. So the treating doctor would call
21    the Medical Examiner and explain the
22    situation; and then the Medical Examiner
23    could give permission?
24 A. Correct.

**Page 92**

1  Q. Based on the information from the call?
2  A. Right. And the complaint that the
3     employees had was these first calls were
4     going to a Tissue Bank International
5     employee, whose primary objective was to
6     get as many organs as they can for bonuses
7     and --
8  Q. Are you familiar with the fact that Tissue
9     Bank International, TBI has received
10    national awards for its program?
11 A. Yes, I am. They used to show us movies
12    all the time. A few times they would
13    bring in and show movies.
14 Q. Okay. And now I'll just digress for a
15    second. But you do understand the idea of
16    harvesting organs for transplant is not a
17    bad one?
18        MS. FRANKL: Objection. You can
19    answer. You can answer.
20 A. Legally, I am all for it.
21 Q. Okay. So you don't see anything
22    fundamentally wrong with harvesting
23    organs?
24 A. Absolutely not. I just want the public to

Case 1:04-cv-10508-DPW    Document 17-4    Filed 04/15/2005    Page 15 of 19

Timothy J. Manning, III - February 14, 2005    Manning and Bryson vs. Mass. OCME, et al

Page 109

1  oversight of many of the laptops and
2  computers.
3  Q. Okay.
4  A. And gadgets disappeared.
5  Q. So it was a management issue, not a
6     criminal issue?
7  A. I don't think that is my, my discretion to
8     make.
9  Q. Well, you're a citizen. Did you think
10    that somebody was stealing state property?
11 A. Absolutely.
12 Q. Did you call the police?
13 A. Did I call the police, no. But I let
14    Public Safety know when I met with them
15    that one of the things that happened in
16    there was, I would rather not use the
17    gentleman's name if that is okay, $32,000
18    comes into the Chief Medical Examiner's
19    Office and the person takes approximately
20    half, $16,000.
21 Q. Before we get into that one, I want to go
22    back to the digital camera and such.
23 A. Okay.
24 Q. Who took them?

Page 110

1  A. I don't know who, who would -- I know I
2     didn't take anything.
3  Q. Okay. So you don't know if anyone took
4     them, you don't know who took them, if
5     they were taken?
6  A. Yes, I do.
7  Q. You do know?
8  A. Yes.
9  Q. What do you know?
10 A. There was an employee of Tissue Bank
11    International.
12 Q. Mm-hmm.
13 A. Who allegedly was taking digital cameras,
14    other stuff. I believe it was Doctor
15    Zain's that disappeared.
16 Q. Okay.
17 A. And allegedly, he was found selling them
18    on EBay. And you can check your files,
19    but I believe that that person wasn't
20    prosecuted. The other --
21 Q. Well, who would prosecute that person?
22 A. I would think either the DA for Suffolk or
23    the Attorney General's Office.
24 Q. Okay.

Page 111

1  A. And the other thing that we talked
2     about --
3  Q. Well, let me ask you this. You are saying
4     that this person stole equipment from the
5     state, put it on EBay, and wasn't
6     prosecuted?
7  A. Allegedly. I didn't follow the case.
8  Q. What do you mean allegedly?
9  A. Allegedly, there was a credit card that
10    was used for a Melissa Christie.
11 Q. Okay. So this is Melissa Christie who was
12    doing all this?
13 A. No. It was her credit card, I guess, the
14    person used.
15 Q. Okay. Well, what I am asking you, sir, is
16    who is it, who did you see or who do you
17    have evidence that took, for instance, the
18    digital camera from the Office of the
19    Chief Medical Examiner and put it on EBay?
20 A. I don't have evidence. That is what I was
21    told.
22 Q. By whom?
23 A. By employees of the office.
24 Q. All right. So word around the office is

Page 112

1  somebody is stealing stuff and putting it
2  on EBay?
3  A. Correct.
4  Q. Okay.
5  A. And was ultimately fired.
6  Q. And this is somebody that doesn't even
7     work for the office; they are a TBI
8     employee?
9  A. Correct.
10 Q. Now, you mentioned the 30,000 something
11    dollars that went missing or part of it
12    went missing?
13 A. Yes. Basically, what happened was one of
14    my complaints, as we discussed earlier,
15    was this regime bringing people into the
16    Agency.
17 Q. Yes.
18 A. Well, one of the persons that Richard St.
19    Louis had the Agency hire was this fellow
20    who, talking to the supervisor, couldn't
21    understand why since he had so many
22    medical issues they would hire this
23    person. So because he had medical issues,
24    what they did was they accommodated him,

# Exhibit L

Page 81

1  also working for Tissue Bank
2  International. So I really can't answer
3  that question as far as --
4  Q. Well, I think you have answered my
5  question, but let's be clear.
6  A. Okay.
7  Q. Was this corpse ever -- excuse me. Was
8  this individual ever on life support at
9  the Office of the Chief Medical Examiner
10 at Albany Street?
11 A. No. No one is on life support at the
12 Office of the Chief Medical Examiner at
13 Albany Street.
14 Q. So the activities of this allegedly
15 inappropriate harvesting occurred at
16 Boston Medical Center?
17 A. Exactly.
18 Q. And we are clear that the Chief Medical
19 Examiner's autopsy room is not Boston
20 Medical Center?
21 A. Yes, we are clear.
22 Q. Okay. And we are clear that Doctor Evans
23 did not harvest any organs over at the
24 Boston Medical Center?

Page 82

1  A. I -- I can't answer that. I am not sure
2  if they had his permission or didn't have
3  his permission or whether he was actually
4  there.
5  Q. No, no. That he actually harvested the
6  organs.
7     Do you believe that Doctor Evans
8  went to Boston Medical Center and
9  harvested organs?
10 A. No, I don't believe that.
11 Q. Okay. Do you believe that --
12 A. I don't believe that.
13 Q. Okay.
14 A. I don't know.
15 Q. At any time?
16 A. I don't believe so.
17 Q. Okay. Now, excuse me. You mentioned that
18 the family of this unnamed individual
19 spoke to Derryck Sheen.
20 A. Yes.
21 Q. Okay. And what was the conversation that
22 they had with Derryck Sheen, if you know?
23 A. The information I got is through Derryck
24 Sheen, basically, that, you know, they had

Page 83

1  asked and requested that they keep, you
2  know, not do anything to the body.
3  Q. Okay.
4  A. And keep the body.
5  Q. Request it of whom?
6  A. Of Boston Medical Center. Boston City
7  Hospital, it was called at the time.
8     That nothing be done, that they
9  were on their way, and they just wanted to
10 say their last good-byes.
11 Q. Okay.
12 A. And to keep him alive on life support.
13 When they got there, that didn't happen.
14 Q. Okay. Did Derryck Sheen say to you that
15 they called Doctor Evans or a member of
16 the Chief Medical Examiner's staff?
17 A. I don't recall.
18 Q. Well, did you speak to Doctor Evans about
19 such a gory tale that organs were being
20 harvested before a family could say their
21 last good-byes to a family member?
22 A. No.
23 Q. Okay. Now, Derryck Sheen relayed this
24 information to you?

Page 84

1  A. Yes.
2  Q. Okay. Why, if you know?
3  A. He had known that either I was intending
4  to go downtown to Public Safety or I had
5  gone downtown to Public Safety.
6  Q. What does that mean?
7  A. Regarding irregularities at the Chief
8  Medical Examiner's Office.
9  Q. So word was out at the Chief Medical
10 Examiner's Office that you were going
11 downtown to talk about problems there?
12 A. Correct. I mean Erin Greeley knew about
13 it. It was her mom that set up the
14 meeting.
15 Q. Okay.
16 A. Jay St. Ives actually drove me down there.
17 And Derryck was aware that I cared what
18 was happening at the Chief Medical
19 Examiner's Office.
20 Q. Okay. So when he heard that you were
21 heading downtown, as you phrase it, he
22 told you put this on the list of things to
23 talk about with the Under Secretary?
24 A. He had already told me that and I had said

# Exhibit M

Case 1:04-cv-10508-DPW    Document 17-4    Filed 04/15/2005    Page 19 of 19

Timothy J. Manning, III - February 14, 2005          Manning and Bryson vs. Mass. OCME, et al

**181**

1  Q. You mentioned an FBI investigation.
2  A. Yes, I did.
3  Q. Okay. Were you -- at what point did you
4     become involved in the FBI investigation?
5  A. When my attorney contacted me and told
6     both Joe and myself that they wanted to
7     meet with us.
8  Q. Okay. And is it your understanding that
9     the FBI investigation had been ongoing at
10    that point?
11 A. It was my understanding that it had gone
12    on from that point, yes.
13 Q. So it is your understanding that the FBI
14    had begun investigating these issues that
15    you addressed with the federal grants
16    prior to meeting with you?
17 A. Yes.
18 Q. Okay. And just quickly, you mentioned
19    meeting with a Mark, was it Mark Delaney
20    of the AG's Office?
21 A. Yes.
22 Q. And he was a lieutenant, you stated?
23 A. I believe he was a lieutenant at the time.
24 Q. Okay. How often did you meet with him?

**182**

1  A. Once. And then after this meeting when
2     Mr. Cronin asked to see my whistleblower's
3     card, I gave him a call. So I talked to
4     him once at his office at the AG's Office
5     and once by telephone in May of 2003.
6  Q. And do you know what, if anything,
7     resulted from those conversations with
8     Mark Delaney?
9  A. I don't.
10        MS. O'NEIL: Okay. I don't have
11 any further questions.
12        MS. FRANKL: I have no questions.
13        MS. O'NEIL: Great.
14        COURT REPORTER: Ms. Frankl, do
15 you want a copy of the transcript?
16        MS. FRANKL: I do.
17        MS. O'NEIL: Thank you very much.
18        MS. FRANKL: Thank you.
19        COURT REPORTER: So I will e-mail
20 you the transcript and send it to you
21 tomorrow morning. Ms. Frankl, do you want
22 yours e-mailed and sent for tomorrow too?
23        MS. FRANKL: Yes, please.
24        MS. O'NEIL: Thank you.

**183**

1        MS. FRANKL: Thank you.
2        THE WITNESS: Thank you.
3        (At which time the matter was
4  concluded at 12:05 p.m.)

**184**

Excerpt from Rule 30(e):
Submission to Witness; Changes; Signing.

When the testimony is fully transcribed, the deposition shall be submitted to the witness for examination and shall be read to or by him, unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them.

* * * * * * * * * * * * * * * * * * * * * * * * * *

I, TIMOTHY J. MANNING, III, have examined the above transcript of my testimony and it is true and correct to the best of my knowledge, information and belief. Any corrections are noted on the errata sheet.

Signed under the pains and penalties of perjury this _____ day of _____, 2005.

_____
Timothy J. Manning, III

Subscribed and sworn to before me this ____ day of _____, 2005.

_____
Notary Public

My Commission Expires: